UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,

    Plaintiffs,

    -against-

DAVID ABAYEV, RICHARD ANDERSON, MIKHAIL BAYBEKOV, MARKIEL BOROOCHOV, OLEG BORUKHOV, ALEXANDER CHERNYSHEV, YAKUB DAVYOV, MIKHAIL FISUN, VLADIMIR GAVRILOV, OLGA GINDINOVA, STANISLAV GLIKMAN, SOFIA IBORO, VYACHESLAV KHAIMOV, ROMAN KHAITOV, ALINA KHARISOVA, YEFIM KLIKSHTEYN, ARTUR LEVIT, MICHAEL MAGOR, EDUARD MERGOLD, SIMON MIRAKOV, DMITRIY PROSOLOV, ROSTISLAV REYZIS, ALBERT RUBINOV, AHARON SHIMONOV, VYACHESLAV SOROKIN, GRIGORIY TOKAR, PENAY YAGUDAEV, ALBERT YAKUBOV, YAKOV YOUNATANOV, ALENA ZAKHAROVA, AK GLOBAL SUPPLY CORP, AZCARE INC., BIG APPLE MED EQUIPMENT INC, CENTRAL SUPPLIES OF NY CORP, EZ TRIBORO SERVICES, INC., FIVE BOROUGH SUPPLY INC, FRONTLINE FITTERS SURGICAL SUPPLY INC, HEALTH CHOICE PHARMACY INC, HEALTHY LIVING MEDICAL AND SURGICAL PRODUCTS, INC., HEALTHY SUPPORT, INC., ISUPPLY MEDICAL INC, LIVE AGAIN MEDICAL SUPPLY INC., M & M SUPPLIES GROUP INC, METAMED SPORTS & SUPPLY INC., MFS SUPPLY CORP, MOGUL SUPPLIES INC, NEW CAPITAL 1 INC., PROTECHMED INC, RVS SUPPLY CORP, SALUTEM PRODUCTS CORP, SP ONE SERVICES, INC., SUTPHIN SUPPLY INC, UNICAST, INC, UNION DME CORP, U.S. HEALTH PRODUCTS INC., V V X, INC., WALLEGOOD INC., YBD UNIVERSAL CORP, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20,

    Defendants.

CIVIL ACTION

20-CV-3302

COMPLAINT

(TRIAL BY JURY DEMANDED)

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (collectively "**Plaintiffs**" or "**Allstate**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants David Abayev, Richard Anderson, Mikhail Baybekov, Markiel Boroochov, Oleg Borukhov, Alexander Chernyshev, Yakub Davyov, Mikhail Fisun, Vladimir Gavrilov, Olga Gindinova, Stanislav Glikman, Sofia Iboro, Vyacheslav Khaimov, Roman Khaitov, Alina Kharisova, Yefim Klikshteyn, Artur Levit, Michael Magor, Eduard Mergold, Simon Mirakov,

Dmitriy Prosolov, Rostislav Reyzis, Albert Rubinov, Aharon Shimonov, Vyacheslav Sorokin, Grigoriy Tokar, Penay Yagudaev, Albert Yakubov, Yakov Younatanov, Alena Zakharova (collectively "**Retail Owners**"), AK Global Supply Corp, Azcare Inc., Big Apple Med Equipment Inc, Central Supplies of NY Corp, EZ Triboro Services, Inc., Five Borough Supply Inc, Frontline Fitters Surgical Supply Inc, Health Choice Pharmacy Inc, Healthy Living Medical and Surgical Products, Inc., Healthy Support, Inc., iSupply Medical Inc, Live Again Medical Supply Inc., M & M Supplies Group Inc, MetaMed Sports & Supply Inc., MFS Supply Corp, Mogul Supplies Inc, New Capital 1 Inc., Protechmed Inc, RVS Supply Corp, Salutem Products Corp, SP One Services, Inc., Sutphin Supply Inc, Unicast, Inc, Union DME Corp, U.S. Health Products Inc., V V X, Inc., Wallegood Inc., YBD Universal Corp (collectively "**Retailers**"; Retail Owners and Retailers are collectively referred to as "**Retail Defendants**"), John Does 1 through 20, (collectively "**Wholesale Owners**"), and ABC Corporations 1 through 20 (collectively "**Wholesalers**"; Wholesalers and Wholesale Owners are collectively referred to as "**Wholesale Defendants**"), (collectively the Retail Defendants and Wholesale Defendants are referred to herein as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from at least July 2012, and continuing through the date of the filing of this Complaint, Defendants engaged in separate, but fundamentally similar schemes to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $1,200,000.00 that Defendants stole from Plaintiffs through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices.  As used herein, (i) "DME" generally

refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.     At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by the Retailers was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, one or more of the Retail Owners, through their respective Retailers, entered into separate arrangements with one or more of the Wholesale Defendants, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     On information and belief, pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Retailers;

(ii) fabricating and/or falsifying DME prescriptions by:

(a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME and/or orthotic devices;

(b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME and/or orthotic devices; and

(c) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME and/or orthotic device(s) prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and

(iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.      The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, the Retailers routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Claimants" or "No-fault Claimants"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.     On information and belief, in many instances, the Retail Owners submitted to Plaintiffs, through their respective Retailers, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.    On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided one or more of the Retailers with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices. Other times, the Wholesale Defendants provided the Retailers with fraudulent wholesale invoices that reflected DME and/or orthotic devices that were never actually provided to Retailers.  In fact, irrespective of whether any DME and/or orthotic devices were actually provided to Retailers, the wholesale invoices typically reflected prices that exceeded 10 times the actual prices that the Retailers paid to the Wholesale Defendants and/or were sufficiently generic and devoid of detail to allow the Retailers to seek reimbursement for expensive, complex DME when simple and/or counterfeit DME was provided.

11.    On information and belief, in some instances, to create the illusion that the Retailers paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, one or more of the Retailers issued checks to the Wholesale Defendants for the full amounts reflected on the wholesale invoices. The Retailers then used those checks to demonstrate to Plaintiffs, and others, that they had paid the false wholesale invoice amounts. In reality, the Wholesale Defendants converted the checks they received from the

Retailers to cash and secretly returned to the Retailers a portion of the profits of the scheme through kickbacks or other financial compensation. These covert cash transactions were facilitated through various clandestine arrangements among the Retailers, the Wholesale Defendants, check brokers, check cashers and/or others unknown to Plaintiffs.

12.     On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which then was used for, among other things, kickbacks to the No-fault Clinics from which the Retailers received fraudulent prescriptions for DME and/or orthotic devices.

13.     On information and belief, in other instances, the Retail Owners, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items and bill for such items under expensive codes for complex DME when, in fact, the items were cheaply manufactured.

14.     On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

15.     After obtaining the fraudulent prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants and/or counterfeit DME from the non-party wholesalers and suppliers, the Retail Owners, through their respective Retailers, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they

paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

16.     In order to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiffs by the Retail Owners through their respective Retailers in support of their fraudulent claims, including the wholesale invoices, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

17.     On information and belief, the Retail Owners, through their respective Retailers, routinely purchased basic, low-quality and inexpensive items from the Wholesale Defendants or other suppliers, but submitted documents, including, but not limited to, in some instances, inflated wholesale invoices, to insurers, including Plaintiffs, that failed to accurately reflect the actual nature, quality, and purchase price of each item.

18.     On information and belief, in support of their claims for reimbursement, and to facilitate the fraud described herein, the Retail Owners, through their respective Retailers, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which the Retail Owners, through their respective Retailers, billed Plaintiffs.

19.     On information and belief, in many instances and pursuant to the agreements between the Retailer Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retailer Defendants then submitted

to Plaintiffs the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.  On information and belief, in other instances where the patient did not sign the delivery receipt, the Retailers, working with the No-fault Clinics, arranged for the No-fault patient's signature to be forged on the delivery receipt, thereby falsely representing that the patient acknowledged receipt of the billed-for DME and/or orthotic devices.

20.     At all relevant times mentioned herein, Defendants collectively utilized a common fraudulent blueprint as a business plan, sharing common documentation, using the same fraudulent billing codes, using prescriptions from the same No-fault Clinics, with the same battery of DME prescribed to nearly every patient, making the same misrepresentations, and engaging in virtually identical patterns of fraud that were not the product of happenstance, but instead evidence of related and parallel fraudulent billing schemes that trace back to a common genesis and framework.

21.     In order to execute the same fraudulent blueprint, at all relevant times mentioned herein, the Retail Owners, through their respective Retailers, undertook distinctly common actions, including but not limited to one or more of the following: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) paying fees to the Wholesale Defendants in exchange for fraudulent wholesale invoices that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Claimants to ensure that

they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular, and (vi) systematically submitting bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that the Retail Owners, through their respective Retailers, determined should be prescribed by the No-fault Clinics, with virtually every claimant receiving substantially similar DME and/or orthotic devices.

22.     At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, engaged in a fraudulent billing scheme involving the same or similar material misrepresentations and/or omitted material statements in No-fault claims submitted to Plaintiffs for payment. In that regard, each and every bill and supporting documentation submitted by the Retailers contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants; (ii) false and misleading statements as to the amounts the Retailers were entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; (v) false and misleading wholesale invoices that greatly inflated the true cost and/or quantity of the DME and/or orthotic devices purportedly supplied to No-fault Claimants, and which failed to provide a meaningful description of the DME and/or orthotic devices provided (i.e., make and model) and/or additional information necessary to determine whether the charges submitted are legitimate; and (vi) fabricated, false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic

devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby the Retailers paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent and fabricated prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices.  On information and belief, all of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that the Retailers could submit to Plaintiffs and other insurers under the No-fault Law.

23.     By way of further example and not limitation of Defendants' nearly identical parallel schemes to defraud, every Retailer submitted the same type of documentation in support of their claims for reimbursement, including, but not limited to, substantially similar delivery receipts and assignment of benefits forms, many containing the same typos, misspellings and stray marks, and purporting to document the delivery of the same or similar battery of DME and/or orthotic devices.   By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the Retailers containing substantially similar delivery receipts and/or assignment of benefits forms that were obviously based on a shared template.

24.     In furtherance of the schemes to defraud alleged herein, Defendants undertook identifiable fraudulent actions pursuant to a common multiple part blueprint under the same reimbursement system billing for the same DME, following the same billing protocol, using the same billing codes and making the same multiple misrepresentations.

25.     By way of further example and not limitation that Defendants engaged in a common, uniform scheme to defraud, nearly all of the Retail Defendants submitted bills to Plaintiffs for reimbursement using the same types of codes that were not recognized by, or

otherwise listed in, the relevant New York State Medicaid fee schedule ("phantom codes") in effect at the time the Retailers purported to supply the listed items to patients.  By billing under the same phantom codes for the same items, the Retailers charged Plaintiffs inflated amounts for cheap DME, materially misrepresenting the amounts that they were entitled to receive, and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for reimbursement.  By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the Retailers submitted fraudulent bills for Non-Fee Schedule items, often using the same phantom codes for the same items.

26. The use of identical, non-existent product codes to bill for the same items across multiple Retailers cannot be the result of coincidence, but rather, indicates the use of a common blueprint and parallel scheme to defraud.

27. In addition to utilizing the same phantom codes for the same items, the Retail Defendants engaged in other types of billing fraud that were identical in scope.  For example, nearly half of the Retailers, as identified further below, routinely submitted bills to Plaintiffs for "eggcrate mattresses" (a Non-Fee Schedule item), which is nothing more than a thin, foam mattress *pad*, using code E0272, which is a Fee Schedule code reserved for a "Foam Rubber Mattress"; and/or code E0184, which is a Fee Schedule code reserved for a "Dry Pressure Mattress."  By selecting an existing fee schedule code for a *mattress* that the foregoing Retailers did not actually provide, the identified Retailers materially misrepresented the amounts they were entitled to receive and further deceived Plaintiffs in paying amounts in excess of what the No-fault Law would have otherwise allowed for reimbursement, in exactly the same way.

28.     On information and belief, in these and in other ways set forth herein, the Defendants engaged in a pattern of similar and/or concerted conduct to defraud insurers in general, and Plaintiffs in particular.

29.     In carrying out the scheme to defraud, Defendants stole in excess of $1,200,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq.* (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

30.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Claimants can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

31.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices.  Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs to the Retailers for medical

equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

32.     The Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, the Retailers accepted (and continue to accept) assignments of benefits from Claimants and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

33.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., the Retailers submitted (and continue to submit) bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

34.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Retailers contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

35.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

36.      Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to

reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

37.     Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Claimants under the No-fault law. 11 N.Y.C.R.R. § 68.1.

38.     Effective July 11, 2007, the WCB established a fee schedule for DME and orthotic devices, which adopts the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). The Fee Schedule was, and is, in effect at all relevant times mentioned herein.

39.     With respect to items that are not on the Fee Schedule (hereinafter " Non-Fee Schedule" items ), the regulations further provide:

> [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

*Id.*

40.     Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  For Non-Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net

acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1.; 12 N.Y.C.R.R. § 442.2(a).

41. Pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

42. Moreover, to be eligible for reimbursement under the No-fault law, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

43. At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by the Retail Owners, through their respective Retailers, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiffs, and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

44. At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Claimants.

45.     As set forth in the "Non-Fee Schedule Scheme to Defraud" below, nearly all the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein the Retailers misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, the Retailers were utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes"); (ii) the charges reflected on the Retailers' bills were in accordance with 12 N.Y.C.R.R. § 442.2, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or orthotic devices purportedly provided were reimbursable pursuant to the Fee Schedule, when they were not.  In doing so, the Retail Owners identified in the "Non-Fee Schedule Scheme to Defraud" section below, through their respective Retailers, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

46.     In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Owners, through their respective Retailers, also routinely submitted fraudulent bills to Plaintiffs for DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fabricated or custom-fit DME and/or orthotic devices.

47.     In addition to engaging in the parallel and related scheme to defraud alleged herein against the Retailers, defendant Health Choice Pharmacy, in furtherance of its scheme to defraud and as set forth below, as a matter of pattern, practice and protocol, routinely provided Claimants with expensive compound topical anesthetic cream (the "Compound Pain Cream"), irrespective of whether such Compound Pain Cream was medically necessary, and submitted fraudulent claims to Allstate for reimbursement. On information and belief, as part of this scheme to defraud, Health Choice Pharmacy entered into kickback arrangement with No-fault Clinics pursuant to which the No-fault Clinics prescribed (the "Prescribing No-fault Clinics") the Compound Pain Cream rather

than commercially available, cheaper, over-the-counter and FDA approved medications for no other purpose than to submit fraudulent and inflated claims to Allstate for reimbursement. As alleged in detail below, the Compound Pain Cream purportedly provided by Health Choice Pharmacy as a result of its illicit arrangements with the Prescribing No-fault Clinics, was not specifically tailored to individuals, and were produced in bulk in direct contravention with Food and Drug Administration ("FDA") regulations regarding the compounding of medications, in order to maximize reimbursement from Allstate without regard to needs of the Claimants.

48.    Moreover, on information and belief, in furtherance of the scheme to defraud alleged herein, and in addition to fraudulently billing insurers, and Plaintiffs in particular, for DME and/or orthotic devices, Retailers  Azcare, EZ Triboro, iSupply Medical, MetaMed Sports & Supply, New Capital 1, Protechmed, SP One Services, Unicast, and YBD Universal (hereinafter the "Rental Retailers"), as a matter of pattern, practice and protocol, routinely provided Claimants with expensive rental and/or compression DME items that were medical unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

49.    On information and belief, as part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, many of the Claimants are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary.  On the same day as the

surgery, and within a few short days after the surgery, the Rental Retailers deliver to the Claimants expensive rental and/or compression devices that were not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration. In many cases, the Claimants receive up to four or more such medically unnecessary items from the Rental Retailers, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost of for all of the items, as part of the scheme to financially enrich the Rental Retail Owners through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Claimants were actually injured and in need of treatment.

50.     On information and belief, the Retailers and Wholesalers alike were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

51.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided No-fault Claimants with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

52.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud – although that would be troubling enough – rather, they adopted identical fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inflated wholesale

invoices for inexpensive, low quality items, to generating bills that contained codes not recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

53.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retail Defendants' No-fault claims because the Retail Owners, through the Retailers, submitted (1) false and fraudulent insurance claims to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for DME and/or orthotic devices the Retail Defendants never actually supplied to No-fault Claimants.  Such claims continue to be submitted by and/or in the name of the Retailers and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

54.     By way of example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $1 million of unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by claim number, Retailer, date of service and the amount billed.

## NATURE OF THE ACTION

55.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii) New York State common law; and

iii) the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**<u>NATURE OF RELIEF SOUGHT</u>**

56. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

57. Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of the Retailers' unpaid No-fault claims because:

i) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and

ii) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

58. As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $1,200,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A.   Plaintiffs

59.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

62.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

63.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

### B.   The Individual Retail Owner Defendants

64.     David Abayev ("Abayev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Big Apple Med Equipment Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.

65.     Richard Anderson ("Anderson") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Live Again Medical Supply Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

66.     Mikhail Baybekov ("Baybekov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer MetaMed Sports & Supply Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

67.     Markiel Boroochov ("Boroochov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Union DME Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

68.     Oleg Borukhov ("Borukhov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer SP One Services Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

69.     Alexander Chernyshev ("Chernyshev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Wallegood Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

70.     Yakub Davyov ("Davyov") is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer YBD Universal Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

71.     Mikhail Fisun ("Fisun") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer MFS Supply Corp. and, at all times relevant herein, operated, managed, and/or controlled its activities.

72.     Vladimir Gavrilov ("Gavrilov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Unicast, Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.

73.     Olga Gindinova ("Gindinova") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Healthy Support Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

74.     Stanislav Glikman ("Glikman") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Healthy Living Medical and Surgical Products Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

75.     Sofia Iboro ("Iboro") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer iSupply Medical, Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

76.     Vyacheslav Khaimov ("Khaimov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Mogul Supplies Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.

77.     Roman Khaitov ("Khaitov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Central Supplies of NY Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

78.     Alina Kharisova ("Kharisova") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer AK Global Supply Corp. and, at all times relevant herein, operated, managed, and/or controlled its activities.

79.     Yefim Klikshteyn ("Klikshteyn") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer VVX, Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

80.     Artur Levit ("Levit") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Frontline Fitters Surgical Supply Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

81.     Michael Magor ("Magor") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer M & M Supplies Group Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

82.     Eduard Mergold ("Mergold") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer U.S. Health Products Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

83.     Simon Mirakov ("Mirakov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer New Capital 1 Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

84.     Dmitriy Prosolov ("Prosolov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Protechmed Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.

85.     Rostislav Reyzis ("Reyzis") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer RVS Supply Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

86.     Albert Rubinov ("Rubinov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer EZ Triboro Services Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

87.     Aharon Shimonov ("Shimonov") is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer Five Borough Supply Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

88.     Vyacheslav Sorokin ("Sorokin") is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer Five Borough Supply Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

89.     Grigoriy Tokar ("Tokar") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Salutem Products Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

90.     Penay Yagudaev ("Yagudaev") is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer YBD Universal Corp and, at all times relevant herein, operated, managed, and/or controlled its activities.

91.     Albert Yakubov ("Yakubov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Health Choice Pharmacy Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.  Prior to opening Health Choice Pharmacy, Yakubov was the principal, officer, and/or director of Retailer National Medical & Surgical Supply, Inc., previously sued in this district for fraudulently billing insurers, including Plaintiffs, for DME and/or orthotic devices in the matters of *Allstate Ins. Co. et al. v. Yadgarov, et. al,* 11:cv-6187 (PKC)(VMS) and *Government Employeees Ins. Co. et al. v. , National Medical & Surgical Supply, Inc.et, al*, 14-cv-2641 (CBA)(VMS), in which he was alleged to have committed the same and/or similar fraudulent scheme as the DME Retailers herein.

92.     Yakov Younatanov ("Younatanov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Sutphin Supply Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.

93.     Alena Zakharova ("Zakharova") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Azcare Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.      The Retailer Defendants**

94.     AK Global Supply Corp. ("AK Global Supply") was incorporated on or about June 18, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2478 Coney Island Ave., Brooklyn, NY 11223-5022.   AK Global Supply is operated, managed, and/or controlled by Defendant Kharisova and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

95.     Azcare Inc. ("Azcare") was incorporated on or about February 14, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 14 Avenue T, Brooklyn, NY 11223.   Azcare is operated, managed, and/or controlled by Defendant Zakharova and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

96.     Big Apple Med Equipment Inc. ("Big Apple Med Equipment") was incorporated on or about November 27, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 16102 Union Tpke, Ste. B, Fresh Meadows, NY 11366.  Big Apple Med Equipment is operated, managed, and/or

controlled by Defendant Abayev and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

97. Central Supplies of NY Corp ("Central Supplies") was incorporated on or about November 29, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 6721 Central Avenue, Glendale, NY 11385. Central Supplies is operated, managed, and/or controlled by Defendant Khaitov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

98. EZ Triboro Services Inc. ("EZ Triboro Services") was incorporated on or about February 16, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 10035 Metropolitan Avenue, Forest Hills, NY 11375. EZ Triboro is operated, managed, and/or controlled by Defendant Rubinov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

99. Five Borough Supply Inc. ("Five Borough Supply") was incorporated on or about March 6, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2080 E. 24th Street, 1st Fl., Brooklyn, NY 11235. Five Borough Supply is operated, managed, and/or controlled by Defendants Shimonov and Sorokin and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

100. Frontline Fitters Surgical Supply Inc. ("Frontline Filters Surgical Supply") was incorporated on or about February 22, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at

6612 13th Avenue, Brooklyn, NY 11219.  Frontline Fitters Surgical Supply is operated, managed, and/or controlled by Defendant Levit and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

101.    Health Choice Pharmacy, Inc. ("Health Choice Pharmacy") was incorporated on or about November 4, 2014, and purports to be a retail pharmacy, authorized to do business in the State of New York, with its principal place of business located at 86-10 Roosevelt Ave., Jackson Heights, NY 11372.  Health Choice Pharmacy is operated, managed, and/or controlled by Defendant Yakubov and submitted fraudulent claims to Plaintiffs seeking reimbursement for pharmaceutical, DME and/or orthotic devices under the No-fault Law.

102.    Healthy Living Medical and Surgical Products Inc. ("Healthy Living Medical and Surgical Products") was incorporated on or about September 26, 2014, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2618 Avenue Y, Rear, Brooklyn, NY 11235.  Healthy Living Medical and Surgical Products is operated, managed, and/or controlled by Defendant Glikman and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

103.    Healthy Support Inc. ("Healthy Support") was incorporated on or about February 15, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 8006 20th Avenue, Brooklyn, NY 11214.  Healthy Support is operated, managed, and/or controlled by Defendant Gindinova and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

104.    iSupply Medical Inc ("iSupply Medical") was incorporated on or about March 9, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1661 McDonald Ave., Suite 113, Brooklyn, NY 11230.  iSupply Medical is operated, managed, and/or controlled by Defendant Iboro and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

105.    Live Again Medical Supply Inc. ("Live Again Medical Supply") was incorporated on or about December 19, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 4501 Church Ave., Brooklyn, NY 11203.  Live Again Medical Supply is operated, managed, and/or controlled by Defendant Anderson and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

106.    M & M Supplies Group Inc. ("M & M Supplies Group") was incorporated on or about January 3, 2019, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1318 Gravesend Neck Rd., 2nd Fl., Brooklyn, NY 11235.  M & M Supplies Group is operated, managed, and/or controlled by Defendant Magor and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

107.    MetaMed Sports & Supply Inc. ("MetaMed Sports & Supply") was incorporated on or about August 12, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 8941 Gettysburg Street, Suite 102, Bellerose, NY 11426.  MetaMed Sports & Supply is operated, managed, and/or

controlled by Defendant Baybekov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

108.    MFS Supply Corp. ("MFS Supply") was incorporated on or about June 4, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1551 Bath Ave., Brooklyn, NY 11228.  MFS Supply is operated, managed, and/or controlled by Defendant Fisun and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

109.    Mogul Supplies Inc ("Mogul Supplies") was incorporated on or about September 12, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 9622 Queens Blvd., Suite 3, Rego Park, NY 11374.  Mogul Supplies is operated, managed, and/or controlled by Defendant Khaimov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

110.    New Capital 1 Inc. ("New Capital 1") was incorporated on or about December 5, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 9020 138 Place, Jamaica, NY 11435. New Capital 1 is operated, managed, and/or controlled by Defendant Mirakov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

111.    Protechmed Inc ("Protechmed") was incorporated on or about February 1, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 7064 Kissena Blvd., 3rd Fl., Flushing, NY

11367.  Protechmed is operated, managed, and/or controlled by Defendant Prosolov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

112.   RVS Supply Corp ("RVS Supply") was incorporated on or about May 30, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1601 Voorhies Avenue, Suite 3F, Brooklyn, NY 11235.  RVS Supply is operated, managed, and/or controlled by Defendant Reyzis and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

113.   Salutem Products Corp ("Salutem Products") was incorporated on or about April 25, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2921 Avenue S, Floor 1, Brooklyn, NY 11229.  Salutem Products is operated, managed, and/or controlled by Defendant Tokar and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

114.   SP One Services Inc. ("SP One Services") was incorporated on or about May 11, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 6746 80th Street, Middle Village, NY 11379.  SP One Services is operated, managed, and/or controlled by Defendant Borukhov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

115.   Sutphin Supply Inc ("Sutphin Supply") was incorporated on or about March 22, 2018, and purports to be a retail DME supply company, authorized to do business in the State of

New York, with its principal place of business located at 111-12 Sutphin Blvd., Jamaica, NY 11435.  Sutphin Supply is operated, managed, and/or controlled by Defendant Younatanov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

116.    Unicast, Inc ("Unicast") was incorporated on or about July 11, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 6909 164th Street, Fresh Meadows, NY 11365.  Unicast is operated, managed, and/or controlled by Defendant Gavrilov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

117.    Union DME Corp ("Union DME") was incorporated on or about August 3, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 162-16 Union Turnpike, Suite 202, Fresh Meadows, NY 11367.  Union DME is operated, managed, and/or controlled by Defendant Boroochov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

118.    US Health Products Inc ("U.S. Health Products") was incorporated on or about July 12, 2012, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2490 McDonald Avenue, Suite 1F, Brooklyn, NY 11224.  US Health Products is operated, managed, and/or controlled by Defendant Mergold and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

119.    V V X, Inc. ("VVX") was incorporated on or about April 3, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its

principal place of business located at 136 Highlawn Avenue, Brooklyn, NY 11223.  VVX is operated, managed, and/or controlled by Defendant Klikshteyn and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

120.    Wallegood Inc. ("Wallegood") was incorporated on or about March 13, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2662 Gerritsen Avenue, Brooklyn, NY 11229. Wallegood is operated, managed, and/or controlled by Defendant Chernyshev and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

121.    YBD Universal Corp ("YBD Universal") was incorporated on or about May 19, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 6743 Central Avenue, Glendale, NY 11385.  YBD Universal is operated, managed, and/or controlled by Defendants Yakub Davyov and Penay Yagudaev, and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**D.    The John Doe Defendants**

122.    On information and belief, John Does 1 through 20 are the principals, officers, and/or directors of the ABC Corporations 1 through 20.  On information and belief, John Doe Defendants 1 through 20, through the ABC Corporations 1 through 20, entered into kickback and/or other financial compensation agreements with the Retailers to provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled the Retailers to fraudulently bill Plaintiffs.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

E.     **The ABC Corporations**

123.    On information and belief, the ABC Corporations 1 through 20 are additional corporations that purport to be wholesale DME supply companies that supply the Retailers with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers.  These wholesale invoices: (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.  These ABC Corporations 1 through 20 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

124.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

125.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

126.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

127.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

128.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

### FACTUAL BACKGROUND AND ALLEGATIONS
### APPLICABLE TO ALL CAUSES OF ACTION

129.     Plaintiffs underwrite automobile insurance in New York State.

130.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

131.     On information and belief, the Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for their services, the Retailers accept assignments of benefits from the Claimants covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

132.     To process and verify the claims submitted by the Retailers, Plaintiffs required, and the Retailers submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to No-fault Claimants for which the Retailers were seeking reimbursement from Plaintiffs.

133.     In nearly all instances, the prescriptions submitted in support of the Retailers' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

134.    In certain instances, one or more of the Retailer Defendants also submitted wholesale invoices to Plaintiffs in support of their claims for reimbursement, which reflected inflated prices well in excess of what the Retailers actually paid, if anything, for the DME and/or orthotic devices purportedly purchased from the Wholesaler.

135.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process the Retailers' claims within 30 days of receipt of proof of claim.

136.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims, and paid the Retailers based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

137.    The No-fault law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendant of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).  For DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2.

138.    With respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)     the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2.

139.    On information and belief, the Retailers were created as the centerpieces of elaborate schemes to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Claimants received the same or similar battery of DME and/or orthotic devices.

140.    The DME and/or orthotic devices that the Retailers purported to provide, and for which they billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, the Retail Owners, through their respective Retailers, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

141.    On information and belief, the Retail Owners created and controlled the Retailers, which were part of separate, but substantially similar well-organized illegal enterprises that engaged in fundamentally similar, systematic and pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or orthotic devices.  The components of each enterprise followed practices that were part of a racketeering scheme dictated by the Retail Owners, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the wholesale costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices to Plaintiffs as part of their proof of claim, which systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices to Plaintiffs containing generic item descriptions, concealing the manufacturer, make, model, size and quality of the DME and/or orthotic devices purportedly supplied;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered/duplicated in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, the Retailers, through their Retail Owners and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Allstate in particular;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers;

- Unlike legitimate retail DME companies, the Retailers claimed to conduct their daily operations from locations that in some cases had no signage or that were shuttered with no indication that any business was conducted at that location; and/or

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks and/or a fee, provided the Retailers with wholesale invoices that fraudulently inflated the price, quantity and/or item(s) provided, with the payments relating to such wholesale invoices, in some instances, actually serving as the vehicle through which Defendants laundered the money back to the Retail Owners through the use of check cashing establishments.

142.    In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Claimant.

143.    The members of each enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, the Retail Owners engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their Health Care Practitioners ("HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the Retailers could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular;

- Entered into kickback or other financial arrangements with one or more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Claimants;

- Submitted or caused to be submitted, on behalf of the Retailers, prescription forms in support of requests for payment for DME and/or orthotic devices, which they knew to be fabricated and/or fraudulently altered/duplicated;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

144. By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Defendant Wholesalers:

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide wholesale invoices that were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and/or

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to the Retailers, knowing that the Retailers, in turn, would submit them to insurers in support of fraudulent claims for reimbursement.

145.    By way of further example, in furtherance of the scheme to defraud alleged herein,

the Defendant Wholesalers:

- Provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Provided the essential means through which the Retail Owners were able to submit fraudulent bills to Plaintiffs for reimbursement of Non-Fee Schedule DME and/or orthotic devices under the No-fault Law;

- Knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost and quality of the DME and/or orthotic devices reflected in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Converted the checks they received from the Retailers to cash and returned to a portion of the profits of the scheme through kickbacks or other financial compensation;

- Were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and/or

41

- Claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

146. At all relevant times mentioned herein, the Wholesale Owners, either directly or through others acting under and pursuant to their direction, instruction and control, caused fraudulent wholesale invoices to be provided to the Retailers, which they knew or should have known would be used by the Retailers in furtherance of the scheme to defraud alleged herein.

147. At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which the Retail Owners, through their respective Retailers, were able to further the scheme to defraud alleged in this Complaint.

148. At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the fraudulent wholesale invoices that were provided to the Retailers through the Wholesalers would be used by the Retailers to obtain payment from insurers, in general, and Plaintiffs, in particular, in connection with fraudulent claims.

149. At all relevant times mentioned herein, the Retail Owners knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

150. At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, directly or through others acting under and pursuant to their direction, instruction and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

151. At all relevant times mentioned herein, the Retail Owners and Wholesale Defendants, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of

conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

152. On information and belief, beginning in July 2012 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to No-fault Claimants.

153. The Retail Owners incorporated, owned and/or controlled their respective Retailers for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

154. On information and belief, each of the Retailers, through their respective Retail Owners, engaged in virtually identical and parallel schemes to defraud, wherein the Retail Owners: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) obtained fraudulently inflated wholesale invoices from the Wholesale Defendants that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party wholesalers; (v) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on

medical necessity when, in fact, the Retail Owners, through their respective Retailers, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Claimant receiving a substantially similar battery of DME and/or orthotic devices.

155. Each DME enterprise alleged in this Complaint carried out its scheme to defraud though substantially similar means.

156. With the DME Retailers in place, Defendants devised and carried out fundamentally identical schemes to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

157. Regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

158. Such prescriptions are issued for virtually every No-fault Claimant, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

159.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with the Retailers, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to the Retailers by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME and/or orthotic devices; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

160.    In furtherance of the scheme to defraud alleged herein, the prescriptions for DME and/or orthotic devices from the No-fault Clinics were forged by the mangers, owners and/or controllers of the Clinic. By way of example and not limitation, Exhibits "5," "6," and "7" in the accompanying Compendium of Exhibits are affidavits executed by three physicians, Azu Ajudua, M.D. ("Ajudua") and Barry Dublin, M.D. ("Dublin") in connection with an action captioned *Government Employees Insurance Co. v. Champ Medical Supply, Inc.*, Docket No. 16-cv-04823 (NG)(SMG) (E.D.N.Y. Aug. 29, 2016), and Shaikh Ahmed, M.D. ("Ahmed"), in connection with an action captioned *Government Employees Insurance Co. v. Lenex Services,* Docket No. 16-cv-06030 (LDH)(CLP) (E.D.N.Y. Oct. 31, 2016) in which the physicians acknowledge the fraudulent nature of the prescriptions that were generated by the No-fault Clinics, including the following:

- The purported signatures on the prescription forms submitted to insurers by DME retailers to support their claims are fraudulent, in that they are mere photocopies of the physicians' original signatures, affixed to bogus prescription forms;

- The physicians never prescribed much of the DME that appear on prescription forms with the physicians' signatures, which the DME retailers submitted to insurers in support of claims for reimbursement;

- Prescriptions for one or two DME which were written by the physicians were fraudulently altered, with as many as five to six additional DME added to the original prescription, by someone other than the physician;

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were basic, inexpensive items, not the sophisticated and expensive items the DME retailers purportedly provided, and for which the DME retailers submitted bills and sought reimbursement; and

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were inexpensive, flexible DME and/or orthotics intended to supplement a physical therapy regimen, whereas the devices the DME retailers purportedly provided, and billed for, were expensive, rigid items that would impede the prescribed physical therapy routine.

161. On information and belief, in furtherance of the scheme to defraud alleged herein, the use of multiple prescriptions bearing identical signatures is not an isolated incident unique to any one Retailer; rather, multiple Retailers submitted prescriptions to insurers, in general, and Plaintiffs, in particular, bearing the *same* identical HCP signatures, further evidencing a common source, blueprint, mechanism, and plan. By way of example and not limitation, Exhibit "8" in the attached Compendium of Exhibits is a representative sample of prescription forms submitted by Retailer Defendants AK Global Supply, Azcare, EZ Triboro Services, Five Borough Supply, Frontline Fitters Surgical Supply, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, New Capital 1, RVS Supply, SP One Services, Sutphin Supply, Union DME, U.S. Health Products, VVX. and YBD Universal in support of claims for reimbursement to Plaintiffs, wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied.

162. In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the No-fault Claimants directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to the Retailers to eliminate the possibility that the

No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

163.     In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, hot/cold packs, massagers and whirlpools; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the No-fault Claimants.

164.     Similarly, as part of the kickback and/or other financial compensation agreement with the No-fault Clinics, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, elbow supports, cervical traction units, cervical collars, and lumbar cushions, which the Retailers then used to unilaterally determine the DME provided to Claimants in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiffs, in particular.

165.     By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, the Retailers were provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to No-fault Claimants.

166.     By way of example and not limitation, on information and belief, when a HCP issued a prescription for a "cervical collar," the HCP intended for the Claimant to receive a basic,

inexpensive, circular foam collar, which carries a maximum reimbursement rate of $6.80 under the Fee Schedule, using HCPCS Code L0120. Instead, one or more of the Retailers would purport to provide a complex, expensive, hard plastic collar with multiple posts and with occipital and mandibular supports, by billing for such items under HCPCS Code L0180, which carries a maximum reimbursement rate of $233.00.

167.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimants would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

168.    In some instances, the Retailers forged or caused to be forged the No-fault Claimant's signature on the delivery receipt.

169.    In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by the Retailers in support of their claims for reimbursement.

170.    In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Retailers to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

171.    On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retail Owners, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned

herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked.

172.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

173.    In other instances, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers entered into agreements with one or more of the Wholesale Defendants whereby the Wholesale Defendants supplied the Retailers with invoices that were used to document false, inflated and outrageous wholesale costs, which one or more of the Retailers then submitted to insurers, in general, and Plaintiffs, in particular, as part of their proof of claim.

174.    In furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by the Wholesale Defendants to the Retailers included artificially high prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

175.    To the extent the Retailers provided any DME and/or orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from the Wholesale Defendants.

176.    The wholesale invoices provided by the Wholesale Defendants to the Retailers reflected grossly inflated prices, in excess of 10 times the actual prices that the Retailers paid for the DME and/or orthotic devices when they were actually provided.

177.    In furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by the Wholesale Defendants to the Retailers intentionally omitted the make, model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby

ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

178.    In some instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by the Wholesale Defendants to the Retailers were never actually provided to the Retailers; rather, the Wholesale Defendants created and provided the wholesale invoices to the Retailers to create the illusion of a sale.

179.    On information and belief, the wholesale invoices were provided to one or more of the Retailers to camouflage the conversion of the Retailers' checks payable to the Wholesale Defendants, which the Wholesale Defendants cashed at check cashing establishments or through other means.

180.    On information and belief, one or more of the Retailers would issue checks to the Wholesale Defendants for the full amount of the inflated wholesale invoice.  The Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to the Retailers, keeping a portion of the profits of the scheme for themselves.

181.    On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers requested that the Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiffs, that they paid for the wholesale items when, in fact, they did not.

182.    In furtherance of the scheme to defraud alleged herein, one or more of the Retailers routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts, and wholesale invoices that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices purportedly provided to No-fault Claimants.

183.    The Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

184.    In every instance, the wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiffs, in particular, to obtain reimbursement under the No-fault Law in excess of the actual permissible charge for the DME and/or orthotic devices purportedly provided.

185.    In furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

186.    In many cases, the Retailers never actually provided the DME for which they billed Plaintiffs.

187.    In furtherance of the scheme to defraud alleged herein, like the wholesale invoices, the Retailers' bills intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

188.    In furtherance of the scheme to defraud alleged herein, upon receiving the wholesale invoices from the Wholesalers and/or other suppliers, the Retailers, as a matter of pattern and practice, generated and submitted bills to Plaintiffs knowingly misrepresenting the type, quality, and cost of DME and/or orthotic devices purportedly purchased from the Wholesale Defendants and provided to Claimants.

189.    By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, nearly all the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein the Retailers misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, the Retailers were utilizing the exact same phantom codes for which there was no published fee schedule; (ii) the charges reflected on the Retailers' bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in the Retailers' bills corresponded with the equipment purportedly provided.

190.    In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills to Plaintiffs (i) in support of expensive custom-fabricated DME and/or orthotic devices, such as LSOs, knee, wrist, and shoulder braces that were never provided; (ii) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that the Retailer never actually provided.

191.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by the Retailers deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

192.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, such as LSOs, knee, wrist, elbow, and shoulder braces that were never provided.  In other instances, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed.  By way of example and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims in which one or more of the Retail Owners, through their respective Retailers, billed for expensive custom fabricated DME and/or orthotic devices that were never provided.  In addition, Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims in which one or more of the Retail Owners, through their respective Retailers, billed for supports and/or braces that required fittings and adjustments which they never performed.

193.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

1.    **Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule**

194.    In furtherance of the scheme to defraud alleged herein, one or more of the Retail Owners, through their respective Retailers, including, but not limited to, AK Global Supply, Azcare, Central Supplies, Frontline Fitters Surgical Supply, Healthy Living Medical and Surgical

Products, Healthy Support, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, New Capital 1, Protechmed, RVS Supply, Salutem Products, Sutphin Supply, U.S. Health Products, and Wallegood, routinely submitted bills for Non-Fee Schedule items, wherein they misrepresented that those items were reimbursable under the Fee Schedule when, in fact, they were utilizing exact same phantom codes for the same items that were not listed on the relevant Fee Schedule in existence at the time. *See* Exhibit "2."

195.    By way of example and not limitation one or more of the Retail Owners, through their respective Retailers, including, but not limited to, AK Global Supply, Azcare, Central Supplies, Healthy Living Medical and Surgical Products, Live Again Medical Supply, M & M Supplies Group, MFS Supply, RVS Supply, Sutphin Supply, US Health Products and Wallegood routinely submitted bills to Plaintiffs for "Heat Lamp, with stand, includes bulb, or infrared element" and/or "Heat Lamp" units using phantom codes E0200 and/or E0205, which are not recognized in the Fee Schedule, in amounts ranging from $113.00 to $259.65 notwithstanding that, to the extent any DME was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00.  Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs wherein the above listed Retailers submitted fraudulent bills for a heat lamp unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

196.    By billing under the same phantom codes for the heat lamp units one or more of the Retail Owners, through their respective Retailers, billed and were paid nearly *ten times* what they would have otherwise have been entitled to receive, if anything, under the No-fault Law.

197.    By way of further example and not limitation, one or more of the Retail Owners, through their respective Retailers, including, but not limited to Azcare, Salutem Products and Live Again Medical Supply routinely submitted bills to Plaintiffs for "portable (overtub type)" and/or "nonportable (built-in type)" "whirlpools," using phantom codes E1300 and/or E1310, respectively, which were not recognized under the relevant Fee Schedule in existence at the time, in amounts ranging from $566.17 to $719.98, notwithstanding that, to the extent anything was provided, the whirlpools are inexpensive "jet spas," for which the usual and customary price charged to the general public is no more than $40.00.   Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs wherein the above-listed Retailers submitted fraudulent bills for whirlpools using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

198.    By billing under the same phantom codes for the whirlpools, one or more of the Retail Owners through their respective Retailers, billed and were paid almost six times more than they would have otherwise have been entitled to receive, if anything, under the No-fault Law.

199.    Separate and apart from billing for the same heat lamps and whirlpools under the same phantom codes not recognized under the Fee Schedule, one or more of the Retail Owners, through their respective Retailers, routinely submitted bills for other Non-Fee Schedule items using the same phantom codes in which they materially misrepresented that the items were reimbursable under the relevant Fee Schedule in existence at the time and the amount they were entitled to receive.   By way of example and not limitation:

- The Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Azcare, Live Again Medical Supply, M & M Supplies Group, MetaMed Sports & Supply, MFS Supply, New Capital 1, RVS Supply and Sutphin Supply routinely submitted bills to Plaintiffs for "Water Circulating Heat Pad with Pump" units using phantom code E0217, in amounts ranging from $298.50 to $622.13,

notwithstanding that, to the extent anything was provided, the water circulating units were cheap aqua relief systems reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $200.00. Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for a water circulation unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Live Again Medical Supply and Salutem Products submitted bills to Plaintiffs for TENS units and/or EMS Units, using phantom codes E0745, and/or E0762 in amounts ranging from $588.88 to $633.24 notwithstanding that, to the extent anything was provided, the stimulator units are actually cheap "digital therapy machines" and/or TENS/EMS units, reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for stimulator units using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Central Supplies and Sutphin Supply, routinely submitted bills to Plaintiffs for "TENS/EMS Placement Belts" and/or "TENS Unit Belts" using phantom code E0731, in amounts ranging from $83.79 to $318.34, notwithstanding that, to the extent any DME was provided, the belts were thin cloth wraps lacking electrode pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailer submitted fraudulent bills for EMS/TENS placement belts using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Central Supplies, Healthy Support, and Live Again Medical Supply routinely submitted bills to Plaintiffs for "Bed Boards" using phantom codes E0273 and/or E0315 in amounts ranging from $45.00 to $107.89, notwithstanding that, to the extent any DME was provided, the bed board purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of

claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for bed boards using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

200.    By submitting to Plaintiffs bills that contained the exact same phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost plus 50%, or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule code and the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected in their bills.

201.    Consequently, by submitting to Plaintiffs bills that contained the exact same phantom codes not recognized under the relevant Fee Schedule in existence at the time for the same items, the Retail Owners, through their respective Retailers, uniformly, deliberately and materially misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for medically necessary DME and/or orthotic devices.

202.    In addition to containing phantom codes that are not recognized under the relevant Fee Schedule in existence at the time, the Retailers' bills routinely contained grossly inflated charges, supported by fraudulent wholesale invoices, where any wholesale invoices were supplied at all, for DME and/or orthotic devices that were inexpensive and of poor quality.

**2.      Fraudulent Billing Using Code E1399**

203.    In furtherance of the scheme to defraud alleged herein, many of the Retail Owners, through their respective Retailers, including, but not limited to, AK Global Supply, Azcare, Central

Supplies, Five Borough Supply, Healthy Living Medical & Surgical, iSupply Medical, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, New Capital 1, Salutem Products, SP One Services, Sutpin Supply, Union DME and Wallegood, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399, which is reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs.  Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for Non-Fee Schedule items using Fee Schedule Code E1399.

204.    By way of example and not limitation, the Retail Owners, through their respective Retailers, including AK Global Supply, Azcare, Five Borough Supply, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, RVS Supply, Salutem Products, Sutphin Supply, Union DME and Wallegood, routinely submitted bills to Plaintiffs for massagers using code E1399, in amounts ranging from $164.00 to $295.50, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the massagers were simple, hand-held massagers for which the usual and customary price charged to the general public did not exceed $30.00.  Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for massagers using Fee Schedule Code E1399.

205.   By way of further example and not limitation:

- The Retail Owners, through their respective Retailers, including, but not limited to, AK Global Supply, Central Supplies, M & M Med Supply, and MFS Supply, routinely submitted bills to Plaintiffs for hydrotherapy whirlpools using code E1399, in amounts ranging from $409.00 to $628.00, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the whirlpools are inexpensive "jet spas," reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $45.00.  Exhibit "19" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for hydrotherapy whirlpools using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Azcare, and Live Again Medical Supply, routinely submitted bills to Plaintiffs for car seats using code E1399 in amounts ranging from $108.00 to $110.85, falsely representing that these amounts were the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the car seats purportedly supplied were inexpensive bubble pads or other material for which the usual and customary price charged to the general public is not more than $13.00.  Exhibit "20" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for car seats using Fee Schedule Code E1399.

- Defendant Tokar, through Salutem Products, routinely submitted bills to Plaintiffs for infrared heating lamps using code E1399, in the amount of 198.00, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $24.00.  Exhibit "21" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailer submitted fraudulent bills for infrared heating lamps using Fee Schedule Code E1399.

- Defendant Chernyshev, through Wallegood, routinely submitted bills to Plaintiffs for water circulating units using code E1399, in the amount of $232.50, falsely representing that this amount was the lesser of the

usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the cold water circulating units purportedly supplied were aqua relief systems reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $158.00. Exhibit "22" in the accompanying Compendium of Exhibits is a representative sample of paid by one or more Plaintiffs in which the above listed Retailer submitted fraudulent bills for water circulating units using Fee Schedule Code E1399.

3.    **Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes**

In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the billed-for items.  By way of example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Azcare, Central Supplies, Five Borough Supply, Frontline Filters Surgical Supply, Healthy Living Medical and Surgical Products, Healthy Support, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, RVS Supply and Salutem Products U.S. Health Products, and Union DME routinely submitted bills to Plaintiffs for "egg crate mattresses," a Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using the Fee Schedule code E0272, which is reserved for a "Foam Rubber Mattress," reimbursable in the maximum amount of $155.52, and/or Fee Schedule code E0184, which is reserved for a "Dry Pressure Mattress," reimbursable in the maximum amount of $153.13.

206.    The Retailers never provided a Foam Rubber mattress to any No-fault Claimant.

207.    The Retailers never provided a Dry Pressure Mattress to any No-fault Claimant.

208.     To the extent any DME and/or orthotic device was provided, the Retailers provided simple bubble mattress pads, which they described as "egg crate mattresses," for which the usual and customary price charged to the general public did not exceed $25.00.

209.     By submitting bills using codes E0272 and/or E0184, the Retail Owners, through their respective Retailers, materially misrepresented that they provided Foam Rubber or Dry Pressure mattresses, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts upwards of seven times what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "23" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for egg crate mattresses by billing for the Non-Fee Schedule DME under a Fee Schedule code.

210.     By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Five Borough Supply, M & M Supplies Group, MFS Supply, RVS Supply, Salutem Products, U.S. Health Products, and Union DME routinely submitted bills to Plaintiffs for "bed boards," which is a Non-Fee Schedule item, using Fee Schedule code E0274, which is reserved for an Overbed Table—an item that is customarily used in conjunction with a hospital bed—reimbursable in the maximum amount of $101.85.

211.     The Retailers never provided an Overbed Table to any No-fault Claimant.

212.     To the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, thin pieces of foldable cardboard or other material, which they described as "bed boards," for which the usual and customary price charged to the general public did not exceed $40.00.

213.    By submitting bills using code E0274, the Retail Owners, through their respective Retailers, materially misrepresented that they provided Overbed Tables, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts more than three times what would otherwise have been a permissible charge for the Non-Fee Schedule item.   Exhibit "24" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for bed boards by billing for the non-Fee Schedule DME under a Fee Schedule code.

214.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including AK Global Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, RVS Supply, Salutem Products and Sutphin Supply, routinely submitted bills to Plaintiffs for "orthopedic car seats," which is a Non-Fee Schedule item, using code T5001, which is reserved for a "Positioning seat for persons with special orthopedic needs," a Fee Schedule item reimbursable in the maximum amount of $609.75 to $756.03, depending on the year the DME was provided.

215.    On information and belief, the Retailers never provided a positioning seat for persons with special orthopedic needs to any No-fault Claimant.

216.    On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, cheap bubble pads, which they described as "orthopedic car seats," for which the usual and customary price charged to the general public did not exceed $20.00.

217.    By submitting bills using code T5001, the Retail Owners, through their respective Retailers, materially misrepresented that they provided positioning seat for persons with special

orthopedic needs, when they did not, also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts ranging from seven (7) to twenty (20) times permissible charge for the Non-Fee Schedule item.  Exhibit "25" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs, where one or more of the Retailers submitted fraudulent bills for positioning seats for persons with special orthopedic needs, by billing for the non-Fee Schedule DME under a Fee Schedule code.

218.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Central Supplies, Five Borough Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, Sutphin Supply, and U.S. Health Products, routinely submitted bills to Plaintiffs for "EMS Units" and/or "TENS Units" a Non-Fee Schedule Item which is nothing more than a cheap "digital therapy machines" using the Fee Schedule code E0730, which is reserved for a "Transcutaneous electrical nerve stimulation (tens) device, four or more leads, for multiple nerve stimulation (dual channel)" reimbursable in the maximum amount of 76.25, and/or Fee Schedule code E0747, which is reserved for a "Osteogenesis stimulator electrical, noninvasive, other than spinal applications," reimbursable in the maximum amount of $3,300.00.

219.    The Retailers never provided a transcutaneous electrical nerve stimulation (tens) device, four or more leads, for multiple nerve stimulation (dual channel) to any No-fault Claimant.

220.    The Retailers never provided an osteogenesis stimulator electrical, noninvasive, other than spinal applications to any No-fault Claimant.

221. To the extent any DME and/or orthotic device was provided, the Retailers provided cheap digital therapy machines, which they described as "EMS Units" and/or "TENS Units" for which the usual and customary price charged to the general public did not exceed $30.00.

222. By submitting bills using codes E0730 and/or E0747, the Retail Owners, through their respective Retailers, materially misrepresented that they provided a transcutaneous electrical nerve stimulation (tens) devices, four or more leads, for multiple nerve stimulation (dual channel) or osteogenesis stimulator electrical, noninvasive, other than spinal applications, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts ranging from double to fourteen (14) times what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "26" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for EMS Units by billing for the Non-Fee Schedule DME under a Fee Schedule code.

223. By way of further example and not limitation, Defendant Tokar, through Salutem Products, routinely submitted bills to Plaintiffs for "TENS Unit Belts," which is a Non-Fee Schedule item, using code E0944, which is reserved for a "Pelvic belt/harness/boot (limited to wheelchair 4-point padded belt)," a Fee Schedule item reimbursable in the maximum amount of $40.90.

224. On information and belief, the Retailers never provided a pelvic belt/harness/boot to any No-fault Claimant.

225. On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, thin cloth wraps lacking electrode pads, which they

described as EMS or TENS Belts for which the usual and customary price charged to the general public did not exceed $15.00.

226.     By submitting bills using code E0944, the Retail Owners, through their respective Retailers, materially misrepresented that they provided a pelvic belt/harness/boot, when they did not, also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts in excess of twice the permissible charge for the Non-Fee Schedule item.  Exhibit "27" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs, where one or more of the Retailers submitted fraudulent bills for positioning seats for persons with special orthopedic needs, by billing for the non-Fee Schedule DME under a Fee Schedule code.

## FEE SCHEDULE SCHEME TO DEFRAUD

**1.     Fraudulent Billing for Custom Fabricated or Custom Fit DME and/or Orthotic Devices.**

227.     The term "custom-made" and/or "custom-fabricated" as used in the New York State Medicaid Fee Schedule refers to any DME, orthopedic footwear, orthotics or prosthetics fabricated solely for a particular person from mainly raw materials that cannot be readily changed to conform to another person's needs. *See* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4.

228.     Raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings and patterns. *Id.*

229.     To bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the items and fabricate the custom-made item based on those measurements. *Id.*

230.    In furtherance of the scheme to defraud, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, despite the fact that, to the extent anything was provided, the DME and/or orthotic devices were cheap, one-size-fits-all items that were not custom fabricated to the Claimants' measurements.

231.    In addition to submitting bills for custom fabricated devices that were never provided, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive pre-fabricated DME and/or orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific patient by an individual with expertise, which they never provided. *Id., see* "Durable Medical Equipment, Orthotics, Procedure Codes and Coverage Guidelines," New York State Dep't of Health (August 1, 2019), at 115.

232.    In furtherance of the scheme to defraud, the Retailers routinely include measurement sheets with the bills submitted to Plaintiffs in an effort to create the illusion that a customized fitting was conducted for the Claimant in connection with providing the custom fabricated or pre-fabricated item.

233.    On information and belief, the measurements were, in many cases, never performed and/or unnecessary as the fabrication or fitting required under the Fee Schedule code was never done.

234.    On information and belief, the Retailers created and included the measurement sheets with their bill submissions for the purpose of created a fraudulent justification for billing under Fee Schedule codes with expensive reimbursement rates when, in fact, the requirements for reimbursement under such codes were never met. By way of example and not limitation,

Defendants AK Global Supply, Azcare, Big Apple Med Equipment, Central Supplies, EZ Triboro Services, Five Borough Supply, Frontline Fitters Surgical Supply, Healthy Living Medical and Surgical Products, Healthy Support, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, New Capital 1, Protechmed, RVS Supply, Salutem Products, SP One Services, Sutphin Supply, U.S. Health Products, Unicast, Union DME, VVX, and Wallegood routinely bills under codes requiring a customized fitting, but never performs any customization.

235.    By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs that require a customized fitting, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

236.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Five Borough Supply, Salutem Products and U.S. Health Products routinely submitted fraudulent bills for LSOs using codes L0629 and/or L0632 which are reserved for more complex custom fabricated DME and/or orthotic devices, which they did not provide.  Exhibit "28" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for LSOs using codes L0629 and/or L0632.

237.    By billing LSOs under codes L0629 and/or L0632, the Retail Owners, through their respective Retailers, falsely represented that they measured and/or customized the DME and/or orthotic device for the No-fault Claimant, when they did not, and/or that they fabricated the DME

and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimants' measurements, tracings and patterns, which they did not.

238.    Separate and apart from billing for custom fabricated LSOs, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Azcare, Big Apple Med Equipment, Central Supplies, EZ Triboro Services, Five Borough Supply, Frontline Filters Surgical Supply, Healthy Living Medical and Surgical Products, Healthy Support, Live Again Medical Supply, M & M Supplies Group, MFS Supply, Mogul Supplies, New Capital 1, RVS Supply, Salutem Products, Sutphin Supply, U.S. Health Products, XVV and Wallegood routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a customized fitting, including, but not limited to, L0627, L0630, L0631, L0633, L0637 and/or L0639, notwithstanding that a customized fitting was never performed. Exhibit "29" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for LSOs using codes L0627, L0630, L0633 and/or L0637.

239.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all LSOs for which no customized fitting was ever performed.

240.    Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace that requires a customized fitting, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

241.    The Retail Owners, through their respective Retailers, including but not limited to

AK Global Supply, Azcare, Big Apple Med Equipment, Central Supplies, Frontline Fitters Surgical Supply, Healthy Support, M & M Supplies Group, MFS Supply, Protechmed, RVS Supply, Salutem Products, SP One Services, U.S. Health Products, Unicast and Wallegood routinely submitted bills for knee braces using codes L1810, L1820, L1831, L1832, L1844 and/or L1845, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed, or for custom fabricated knee braces that were never supplied. By way of example and not limitation, Exhibit "30" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for knee braces using codes L1820, L1831, L1832, L1844 and/or L1845.

242.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all knee braces, which were not custom made to the Claimants' measurements and for which no customized fitting was ever performed.

243.    Under the relevant Fee Schedule in existence at the time, the permissible charges for a shoulder support range from $40.00, under code L3650, for a prefabricated shoulder support that requires a customized fitting, to $896.92, under code L3674, for more complex custom fabricated DME and/or orthotic devices.

244.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Live Again Medical Supply, MFS Supply, RVS Supply and Salutem routinely submitted fraudulent bills for shoulder supports using code L3671 and/or L3674 which are

reserved for more complex custom fabricated DME and/or orthotic devices, which were not provided. Exhibit "31" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for shoulder supports using code L3674.

245.    By billing shoulder supports under codes L3671 and/or L3674, the Retail Owners, through their respective Retailers, falsely represented that they measured and/or customized the DME and/or orthotic device for the No-fault Claimant, when they did not; and/or that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimant's measurements, tracings and patterns, which they did not do.

246.    Separate and apart from billing for custom fabricated shoulder supports, to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including but not limited to Central Supplies and Unicast routinely submitted fraudulent bills for shoulder supports using code L3960 notwithstanding that a customized fitting was never performed. Exhibit "32" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for shoulder supports using code L3960.

247.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all shoulder supports for which no customized fitting was ever performed.

248.    Under the relevant Fee Schedule in existence at the time, the permissible charges for wrist braces range from $157.10, under code L3809, for a prefabricated wrist brace that comes of-the-shelf, to $347.95, under code L3806, for more complex models that are custom fabricated.

249.    The Retail Owners, through their respective Retailers, including but not limited to MFS Supply, U.S. Health Products, and Wallegood routinely submitted bills for wrist braces using codes L3807 and/or L3808, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed, or for custom fabricated wrist braces that were never supplied. By way of example and not limitation, Exhibit "33" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for wrist braces using codes L3807 and/or L3808.

250.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all wrist braces, which were not custom made to the Claimants' measurements and for which no customized fitting was ever performed.

**2.      Fraudulent Billing of Cervical Traction Units**

251.    The Retailers, including but not limited to AK Global Supply, Azcare, Big Apple Med Equipment, EZ Triboro Services, Five Borough Supply, Frontline Fitters Surgical Supply, Healthy Living Medical and Surgical Products, Healthy Support, Live Again Medical Supply, MFS Supply, New Capital 1, RVS Supply, Salutem Products, SP One Services, U.S. Health Products, and Wallegood, routinely submitted fraudulent bills to Plaintiffs for cervical traction units under Fee Schedule Codes E0855 and/or E0849.

252.     On information and belief, the cervical traction units purportedly provided by the Retailers are inexpensive replicas or knockoffs of a trademarked cervical traction unit (the "Posture Pump") manufactured and sold by Posture Pro, Inc., and/or other suppliers, with a wholesale price that is a fraction of the cost associated with the authentic device.  By way of example and not limitation, Exhibit "34" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the Retailers submitted fraudulent bills for a cervical traction device.

253.     In particular, on information and belief, the cervical traction units provided by Big Apple Med Equipment, Frontline Fitters Surgical Supply, and Wallegood are replicas or "knockoffs" of the Posture Pump, which were sold and distributed to the Retailers by Comfortland Medical. Inc. ("Comfortland"), under the brand name Comfortmax Cervical Hometrac.

254.     On or about August 15, 2013, Comfortland was sued for patent infringement of the Posture Pump in the matter of *Posture Pro, Inc. v. Comfortland Medical, Inc.*, 13-cv-1252 (JVS) (AN) (hereinafter the "Comfortland Action"), for distributing a knockoff of the Posture Pump cervical traction unit under its Comfortmax Cervical Hometrac brand, which was of inferior quality to the Posture Pump model and which infringed upon the patent held by Posture Pro.

255.     Retailers Big Apple Med Equipment, Frontline Fitters Surgical Supply, and Wallegood purchased the Comfortmax or similar unit from Comfortland, and continue to supply the knockoff device(s) and bill insurers, including Plaintiffs. By way of example and not limitation, Exhibit "35" in the accompanying Compendium of Exhibits is a representative sample of claims submitted to one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for Comfortmax cervical traction devices.

256.    On information and belief, to the extent the Retailers provided a cervical traction unit purportedly trademarked and/or manufactured by Posture Pro, the legitimate acquisition cost of such item is $65.00.

257.    In each of the foregoing bills in Exhibits "34" and "35", to the extent anything was supplied to No-fault Claimants at all, the Retailers provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, regardless of medical necessity and misrepresented the nature, quality and cost of the items in each of the bills submitted to Plaintiffs.

258.    By billing cervical traction units under codes E0855 and E0849, the Retail Owners, through their respective Retailers, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.

**3.      Fraudulent Billing for DME and/or Orthotic Devices Not Provided**

259.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.

260.    By way of example and not limitation, the Retail Owners, through their respective Retailers AK Global Supply, Azcare, Central Supplies, Five Borough Supply, Frontline Filters Surgical Supply, Live Again Medical Supply, M & M Supplies Group, Mogul Supplies, RVS Supply, Sutphin Supply, U.S. Health Products, Union DME, and VVX, and routinely submitted bills to Plaintiffs for cervical collars under codes L0140, L0172, L0174, and/or L0180 in amounts up to and including $233.00, which were not provided as billed, if any were provided at all. By way of example and not limitation, Exhibit "36" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers

submitted fraudulent bills for cervical collars under codes L0140, L0172, L0174, and/or L0180 in amounts ranging from $50.00 to $233.00.

261.    On information and belief, under the relevant Fee Schedule in existence at the time, the permissible charges for cervical collars range from $6.80, under code L0120 for basic, flexible, foam collars, to $322.50, under code L0200, for more complex cervical collars with occipital and mandibular supports meant for patients with severe neck injuries.

262.    On information and belief, to the extent any DME and/or orthotic device was provided, the Retail Owners, through their respective Retailers, provided basic, inexpensive collars that were not medically necessary, inappropriate for the patient and not prescribed by the physician, which should have been billed, if at all, for $6.80 under code L0120.

263.    On information and belief, by billing for cheap, inexpensive foam cervical collars under codes L0140, L0172, L0174 and/or L0180, the Retail Owners, through their respective Retailers, falsely represented that they provided semi-rigid, thermoplastic, two-piece collars, and/or other complex, medically necessary collars, when they did not.

264.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AK Global Supply, Azcare, Five Borough Supply, Healthy Living Medical and Surgical Products, M & M Supplies Group, MFS Supply, Mogul Supplies, RVS Supply, Salutem Products, Sutphin Supply, Union DME, U.S. Health Products, VVX, and Wallegood routinely submitted fraudulent bills to Plaintiffs seeking reimbursement for "lumbar cushions" using codes E2601, E2602, E2611, E2612 and/or E2619, in amounts up to and including $609.75, which they did not provide as billed, if anything was provided at all.  Exhibit "37" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for lumbar

74

cushions under codes E2601, E2602, E2611, E2612 and/or E2619 in amounts ranging from $46.39 to $382.02.

265.    Under the relevant Fee Schedule in existence at the time, codes E2601, E2602, E2611, E2612 and/or E2619 are reserved for DME satisfying the description of "Wheelchair Back Cushion" and/or other wheelchair accessories, and are specifically reserved for support used in connection with a wheelchair.

266.    None of the No-fault Claimants who purportedly received a lumbar cushion or replacement cushion cover from one or more of the Retailers, billed under codes E2601, E2602, E2611, E2612 and/or E2619, was wheelchair bound.

267.    To the extent any DME and/or orthotic device was provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

268.    By billing lumbar cushions under codes E2601, E2602, E2611, E2612 and/or E2619, the Retail Owners, through their respective Retailers, falsely represented that they provided specialized wheelchair cushions and/or covers, when they did not.

## THE PHARMACEUTICAL SCHEME TO DEFRAUD

269.    In furtherance of the scheme to defraud, Health Choice Pharmacy entered into illegal kickback arrangements with No-fault clinics in the New York metropolitan area (the "Prescribing No-fault Clinics") pursuant to which the No-fault Clinics prescribed expensive, pre-formulated compounded pain creams produced in bulk by Health Choice Pharmacy to No-fault Claimants (the "Compound Pain Cream"), rather than commercially available cheaper over-the-counter and Food and Drug Administration ("FDA") approved medications for no other purpose than to submit fraudulent an inflated bill to Plaintiffs for reimbursement.

270.    On information and belief, the Compound Pain Cream purportedly provided by Health Choice Pharmacy as a result of its illicit arrangements with the Prescribing No-fault Clinics, was not specifically tailored to individuals, and was produced in bulk in direct contravention of FDA regulations regarding the compounding of medications, in order to maximize billings to Plaintiffs.

271.    In furtherance of Health Choice Pharmacy's' scheme to defraud, No-fault Claimants who were purportedly involved in automobile accidents would present themselves at the Prescribing No-fault Clinics where they would, as a matter of pattern, practice and protocol, be prescribed Compound Pain Cream irrespective of medically necessity.

272.    On information and belief, once the Compound Pain Cream was prescribed, they would be dispensed directly to No-fault Claimants either at the Prescribing No-fault Clinic, or by Health Choice Pharmacy, without giving the No-fault Claimants any choice as to where their prescriptions would be filled.

273.    Health Choice Pharmacy purported to provide the Compounded Pain Cream to No-fault Claimants, and sought reimbursement directly from the Plaintiffs pursuant to executed "Assignment of Benefits" ("AOB") forms. With regard to the Compounded Pain Cream, Health Choice Pharmacy lists each ingredient separately along with the corresponding charge for each, with the total billed amount ranging as high as thousands of dollars for a single Compound Pain Cream.

274.    On information and belief, at all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Health Choice Pharmacy sought reimbursement in excess of the amounts authorized by the No-fault Law, to the extent such charges were authorized at all.

275.    On information and belief, by entering into kickback arrangements for Compound Pain Cream with the Prescribing No-fault Clinics and dispensing Compound Pain Cream irrespective of medical necessity pursuant to bogus prescriptions, Health Choice Pharmacy engaged in conduct which demonstrated a blatant disregard for the laws of New York State which govern the proper operation of a pharmacy and the proper dispensing of compound drug products, as well as laws which probit illegal fee splitting and the solicitation of patients,.

276.    By way of example and not limitation, New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions, while New York Education Law § 6811 makes it a crime for any person or entity, such as Health Choice Pharmacy, to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

277.    On information and belief, the scheme to defraud orchestrated by Health Choice Pharmacy by which it routinely dispensed formulaic Compounded Pain Cream to Claimants without regard to medical necessity posed a significant risk to the health of such patients, and resulted in the theft of money from Allstate.

1.  **Overview of FDA Compounding Guidelines**

278.    Drug compounding is generally the practice of combining, mixing, or altering ingredients to create a sterile or non-sterile and customized medication tailored to the needs of an individual patient in response to a practitioner's prescription.

279.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 353a (the "FFDCA"), as amended by the Food and Drug Administration Modernization Act of 1997 (FDAMA), addresses the FDA's role in the regulation of drug compounding.

280.    Pursuant to the FFDCA, a new drug, defined as "[a]ny drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized ... as safe and effective." may not be introduced into interstate commerce unless there is an approval process in which the FDA deems the new drug safe and effective.

281.    Pursuant to FDA guidelines, most prescription drugs are required to: (i) undergo premarket approval to demonstrate safety and efficacy; (ii) be labeled with adequate directions for use so patients can safely use drugs for their intended purposes; and (iii) be manufactured according to current good manufacturing practice (CGMP) requirements, which are intended to assure the identity, strength, quality, and purity of drugs by requiring adequate control of manufacturing operations.

282.    Under certain conditions, drug products that are "compounded" are not subject to the foregoing requirements, and therefore do not require FDA approval.

283.    According to FDA guidelines, a drug may be compounded for a patient who cannot be treated with an FDA-approved medication, such as a patient who has an allergy and needs a medication to be made without a certain dye, or an elderly patient or a child who cannot swallow a tablet or capsule and needs a medicine in a liquid dosage form that is not otherwise available.

284.    Congress' intent in adopting the FFDCA's provisions with respect to drug compounding was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing under the guise of compounding." *See* H.R. Rep. No. 105-399, at 94 (1997). As stated by Congress when adopting the FDAMA:

"The exemptions in section (h)(1) are limited to compounding for an individual patient based on the medical need of such patient for the particular drug

compounded. To qualify for the exemptions, the pharmacist or physician must be able to cite a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient. *See* S. Rep. No. 105-43, at 67-68 (1997).

285.     On information and belief, pursuant to FDA guidelines, it is inappropriate to provide a patient with a compounded drug when there is an FDA-approved drug medically appropriate for them.

286.     Because compounded drugs are not FDA-approved, the FDA does not verify their safety, effectiveness, or quality before they are marketed. The FDA also has observed that the labeling of compounded drugs often omits important information such as directions to help ensure that the drugs are used safely and warnings about possible side effects and drug interactions.

287.     The United States has had a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs. Accordingly, in 2012, Congress passed the Drug Quality and Security Act (DQSA), which made important updates to the FFDCA regarding human drug compounding.

288.     In particular, the DQA amended section 503A of the FFDCA to describe the conditions under which compounded human drug products are exempt from the FFDCA sections on FDA approval prior to marketing, current good manufacturing practice (CGMP) requirements, and labeling with adequate directions for use.

289.     By way of example and not limitation, compounded human drug products are exempt from the FFDCA sections on FDA approval prior to marketing, current good

manufacturing practice (CGMP) requirements, and labeling with adequate directions for use if the drug product is "compounded for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient, if the drug product meets the requirements of this section," and if the compounding is "by a licensed pharmacist in a State licensed pharmacy…"

290.     On information and belief, because compounded products are not FDA-approved, such products should not be prescribed as a matter protocol; rather, they should only be prescribed when there is a legitimate medical need specific to an individual patient, and in the absence of commercially available medications.

## 2.  Overview of Compounding Topical Pain Creams

291.     On information and belief, one type of compounded drugs are topical pain creams, the role of which in pain management is not a scientifically proven fact. By way of example and not limitation, according to medical literature, due to the absence of specific compliance and adherence studies comparing topical treatment versus traditional routes in pain management, the role of topical preparations in patient adherence remains obscure.

292.     On information and belief, topical creams "are locally administered treatments such as lidocaine 5% patch, capsaicin, EMLA (eutectic mixture of local anesthetics) cream, lidocaine 2, 5% and prilocaine 2, 5% creams. On information and belief, the ingredients used in the Compound Pain Cream include nonsteroidal anti-inflammatory drugs NSAIDs which are not always appropriate in some clinical settings. For example, it is well known that people who use NSAIDs (other than aspirin) may have a higher risk of having a heart attack or a stroke than

people who do not use those medications, and these events may happen without warning and may even cause death.

293.    On information and belief, the medical standard in reference to topical drug delivery, as presented in the Workers Compensation Board New York Non-Acute Pain Medical Treatment Guidelines, First Edition, September 15, 2014, pages: 37-38, states the following: "For most patients, the effects of long-term use are unknown and thus may be better used episodically. These agents may be used in those patients who prefer topical treatments over oral medications."

294.    On information and belief, with respect to the general guidance for the application of compound creams in treatment of pain, the FDA does not recommend compounded topical creams to be produced for clinical application, and has noted its concern "about the serious public health risks related to compounded topical anesthetic creams.

295.    Exposure to high concentrations of local anesthetics, like those in compounded topical anesthetic creams, can cause grave reactions including seizures and irregular heartbeats. Two death have been connected to compounded topical anesthetic creams. On information and belief, as noted by Dr. Steven Galson, Director of FDA's Center from Drug Evaluation and Research, "[c]ompounded topical anesthetic creams, like all compounded drugs, are not reviewed by FDA for safety and effectiveness, and are not FDA-approved. These high-potency drugs may expose patients to unnecessary risk, especially when they are used without proper medical supervision." Compounded topical anesthetic creams contain "high doses of local anesthetics including lidocaine, tetracaine, benzocaine, and prilocaine. When different anesthetics are combined into one product, each anesthetic's potential for harm is increased. This potential harm may also increase if the product is left on the body for long periods of time or applied to broad areas of the body, particularly if an area is then covered by a bandage, plastic or other dressing.

296.     On information and belief, according to the latest Workers Compensation Board Medical Treatment Guidelines (First Edition, September, 15, 2014, pages: 28-38) regarding Non-Acute Pain, "Topical, oral, and/or systemic compound medications are not recommended."

### 3. <u>The Pharmacy Defendant's Scheme to Defraud</u>

297.     Health Choice Pharmacy engaged in a massive scheme to defraud in which they, as a matter of pattern, practice and protocol, dispensed, or caused to be dispensed, expensive Compound Pain Creams consisting of, among other things, Pentravan Cream, Gabapentin Pow, Ibuprofen Pow, Ethnoxy Diglycol, Cyclobenzaprine HCL Pow, Lidocaine HCL, Baclofen Pow, Ketoprofen Pow (the "Compound Pain Cream"), irrespective of medical necessity, and submitted bills to Allstate for reimbursement.

298.     As part of Health Choice Pharmacy's scheme to defraud, Health Choice Pharmacy entered into kickback or other financial arrangements with the Prescribing No-fault Clinics which, instead of prescribing FDA-approved and/or commercially available medication to Claimants, would prescribe and/or dispense the Compounded Pain Cream without regard to the efficacy of the combination of drugs being combined in the compound.

299.     On information and belief, in furtherance of the scheme to defraud alleged herein, Health Choice Pharmacy provided the Prescribing No-fault Clinics with a list of ingredients contained in the Compound Pain Cream and/or a rubber stamp of the list of ingredients contained in the Compound Pain Cream which was, as a matter of pattern, practice and protocol used on prescription pads to prescribe the Compound Pain Cream to insureds irrespective of medical necessity.

300.     On information and belief, in furtherance of the scheme to defraud alleged herein, Health Choice Pharmacy prepared the Compound Pain Cream in bulk, without regard to the needs

of any particular Claimant, in order to maximize the amount of profit they could reap from mixing the individual ingredients.

301.    On information and belief, in many if not all instances, the Prescribing No-fault Clinics never provided Claimants with the prescriptions for Compound Pain Cream to be filled at a pharmacy chosen by the Claimants. Rather, the Claimants were often given the Compound Pain Cream at the Prescribing No-fault Clinics ever being given the prescription, or in some instances, being told that such medication was being prescribed.

302.    On information and belief, in those instances where Claimants were not given the Compound Pain Cream at the Prescribing No-fault Clinics, they were directed by the Prescribing No-fault Clinics to Health Choice Pharmacy to be provided the Compound Pain Cream.

303.    On information and belief, demonstrative that Prescribing No-fault Clinics prescribed the Compound Pain Cream irrespective of medical necessity as part of an illegal kickback scheme with Health Choice Pharmacy, in virtually all, if not all instances, the Prescribing No-fault Clinics:

- Failed to document in the Claimants' Initial Evaluation Reports why the Compound Pain Cream was medically necessary;

- Failed to document in the Claimants' Initial Evaluation Reports if the Compound Pain Cream was being tailored for the specific patient;

- Failed to document in the Claimants' Initial Evaluation Reports why commercially available over-the-counter, FDA approved medications could not be prescribed instead of the Compound Pain Cream, such as a Claimant allergy;

- Failed to document in the Claimants' Initial Evaluation Reports why commercially available over-the-counter, FDA approved medications could not be prescribed instead of the Compound Pain Cream;

- Failed to document in the Claimants' Follow-up Reports if the Compound Pain Cream was used by Claimants;

304.   On information and belief, the Prescribing No-fault Clinics prescribed, and Health Choice Pharmacy provided, virtually all, if not all Claimants with the same exact Compound Pain Cream, without tailoring it to the specific needs of any individual Claimant.

305.   At all times relevant herein, Health Choice Pharmacy, as well as the Prescribing No-fault Clinics, knew that there were effective, commercially available, FDA-approved and cheaper medications which would have been suitable to prescribe to Claimants, and the Compounded Pain Cream was being prescribed solely to enrich Health Choice Pharmacy and the Prescribing No-fault Clinics.

306.   On information and belief, irrespective of the needs of any individual Claimant, the Prescribing No-fault Clinics prescribed the same pre-made, formulaic Compounded Pain Cream to most, if not nearly all Claimants which contained the following ingredients: Ketoprofen Pow: 20 gms; Lidocaine HCL Pow: 2.5 gms; Ibuprofen Pow: 20 gms; Cyclobenzaprine HCL Pow: 2 gms; Baclofen POW: 2 gms; Ethoxy Diglycol Liq.: 17.50 ml; Gabapentin pow: 6 gms; Pentravan Cream: 50 gms (the "Protocol Ingredients").

307.   On information and belief, the Protocol Ingredients can be easily replaced with cheaper, over-the-counter and readily available substitutes that have substantially similar, if not identical, indications and effects.

308.   On information and belief, because the Compounded Pain Creams were not individualized and tailored to meet specific individual patient needs, were not provided pursuant to medically necessary prescriptions, and were illegally compounded in set formulations in large quantities, Health Choice Pharmacy was in violation of federal law. *See* 21 U.S. C. § 355 and 21 U.S.C. 353a(a).

309.    Health Choice Pharmacy's creation and dispensing of the predetermined, Compound Cream in large quantities, without tailoring such medication to the needs of individual Claimants was not only in violation of federal law regarding the safe manufacture of drugs, but effectively stole in excess of $43,900.00 from Allstate. Exhibit "38" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims paid by one or more Plaintiffs wherein Health Choice Pharmacy submitted fraudulent bills for a Compounded Pain Cream.

310.    21 U.S.C. § 321(p)(1) defines a new drug as "any drug...the composition of which is such that such drug is not generally recognized...as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

311.    Health Choice Pharmacy's Compounded Pain Cream has never been FDA-approved and, therefore, was never verified by the FDA as being safe or effective. To the contrary, the Health Choice Pharmacy's bulk compounding and dispensing of the Compounded Pain Cream exposed Claimants to significant risks including harmful contraindications.

### G.    The Fraudulent Billing Health Choice Pharmacy Submitted to Allstate

312.    Separate and apart from knowingly and fraudulently dispensing the Compound Pain Cream in bulk, without tailoring the cream to any specific needs of any No-fault Claimant, on information and belief, in furtherance of the scheme to defraud alleged herein, Health Choice Pharmacy routinely billed Plaintiffs for Compound Pain Cream at inflated rates in excess of the amounts that would have been permissible under the Pharmacy Fee Schedule.

313.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the average wholesale price (AWP) minus 12% (for brand name drugs) or 20% (for

generic drugs) for each ingredient within the compound creams, together with a nominal dispensing fee.

314. AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

"[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

315. Notwithstanding the Pharmacy Fee Schedule, in furtherance of the scheme to defraud, Health Choice Pharmacy routinely billed Plaintiffs for Compound Pain Cream in inflated amounts that did not take into account any reductions for generic drug pricing (and/or name brand pricing) to the extent applicable, as required by the Pharmacy Fee Schedule.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

316. In furtherance of the scheme to defraud alleged herein, and in addition to fraudulently billing insurers in general, and Plaintiffs in particular, for DME and/or orthotic devices dispensed for Claimants to keep, the Rental Retailers, as a matter of pattern, practice and protocol, routinely provided Claimants with expensive rental and/or compression DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

317. On information and belief, as part of the scheme, the Claimants receiving the expensive rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment. Shortly after the accident, the Claimants are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture and

86

several pieces of DME and/or orthotic devices -- in some instances, receiving up to ten (10) to twelve (12) items.

318.    On information and belief, months after the accident, as part of the fraudulent protocol of treatment, many of the Claimants are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

319.    On information and belief, on the same day as the surgery, and within a few short days after the surgery, the Claimants are prescribed expensive rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, the Claimants receive at least four or more such items, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the items.  By way of example and not limitation, the following Claimants received the same or similar battery of rental DME and/or compression devices:

- In connection with claims submitted on behalf of Claimant AO, claim number 0503745432-02, Plaintiffs were billed for claimant AO received twelve pieces of rental DME and/or compression devices provided by six different companies, amounting to $15,865.18 in total charges, including eight pieces of rental DME and/or compression devices purportedly provided by four different companies over a three-day span. Specifically, on August 24, 2018, retailer Advantage Med Innovations, Inc. ("Advantage Med Innovations") (not named as a defendant in the Complaint) billed Plaintiffs for a cold compression/DVT triple play VT device in the amount of $2,072 for a twenty-eight day period, a nonsegmental pneumatic appliance with pneumatic compressor for $89.56, a sheepskin pad for $19.50, and a CPM for the knee at a cost of $3,444.00 rented for a forty-two day period.  On August 30, 2018, retailer Nu Age Med Solutions, Inc. ("Nu Age Med Solutions") (not named as a defendant in the Complaint) billed Plaintiffs for a sustained acoustic medicine device in the amount of $2,436.00, rented for a forty-two day period, and an ultrasound coupling bandage in the amount of $360.00.  On January 23, 2019, Defendant Unicast billed Plaintiffs for a prothermo ambulatory cold compression device in the amount of $283.00 and a pneumatic appliance for $56.00.  On

the same day, Defendant Protechmed billed Plaintiffs for a pneumatic compressor nonsegmental device in the amount of $531.06 and a nonsegmental pneumatic appliance with pneumatic compressor for $89.56.   On January 24, 2019, the very next day, non-party iSurply LLC ("iSurply") (not named as a defendant in the Complaint) billed Plaintiffs for a SAM sport ultrasound device in the amount of $1,365.00, rented for a twenty-day period.  On January 25, 2019, Advanced Recovery Equipment and Supplies LLC ("Advanced Recovery Equipment") (not named as a defendant in the Complaint) billed Plaintiffs for a CPM device in the amount of $3,570.00, rented for a forty-two day period, a water circulation cold pad with pump in the amount of $1,548.00 purportedly rented for a forty-two day period, and a pad for the water circulating heat unit in the amount of $37.50.

- In connection with claims submitted on behalf of Claimant SG, claim number 0517720982-02, Palintiffs were billed for six pieces of rental DME and/or compression devices, over a two-day span, from three different companies, amounting to $5,019.62 in total charges.   Specifically, on November 28, 2018, Defendant Protechmed billed Plaintiffs for a nonsegmental pneumatic appliance with pneumatic compressor in the amount of $89.56 and a pneumatic compressor nonsegmental device for $531.06.  On the same day, Defendant Unicast billed Plaintiffs a prothermo ambulatory cold compression in the amount of $283.00 and a pneumatic appliance for $56.00.  On November 29, 2018, the very next day, Defendant EZ Triboro billed Plaintiff for a CPM purportedly at a cost of $2,380.00 and a pneumatic compression device at a cost of $1,680.00, both for a rental period of twenty-one days.

- In connection with claims submitted on behalf of Claimant AA, claim number 0459479374-02, Plaintiffs were billed for eight pieces of DME and/or compression devices, from three different companies, amounting to $10,659.80 in total charges.  Specifically, on September 6, 2017 and October 16, 2017 Defendant Protechmed billed Plaintiffs for a pneumatic compressor nonsegmental device in the total amount of $1062.12, and a nonsegmental pneumatic appliance with pneumatic compressor for a total amount of $179.12.   On September 13, 2017, Advantage Med Innovations billed Plaintiffs for a cold compression/ DVT triple play VT device in the amount of $2,072, rented for a twenty-eight day period, and again on October 19, 2017 in the amount of $2072.00, rented for a twenty-seven day period. On September 13, 2017, Advantage Med Innovations billed Plaintiffs for a CTU with pad in the amount of $476, rented for a thirteen day period.  On October 8, 2017, Advantage Med Innovations billed Plaintiffs for a CPM for the knee in the amount of $1,256.00 for an eleven day period and, on October 19, 2017, for a CPM for the shoulder in the amount of $1,875.00, for a twenty-five day period.  On October 19, 2017, Advanced Med Innovations also billed Plaintiffs for a nonsegmental appliance with pneumatic compressor for $89.56.  On October 2, 2017, Nu Age Med Solutions, Inc. billed Plaintiffs for a sustained acoustic medicine device for October 2, 2017 in the amount of $2436.00, rented for a forty-two day period, as well as an ultrasound coupling bandage for $360.

- In connection with claims submitted on behalf of Claimant SR, claim number 0519495443-02, Plaintiffs were billed for six pieces of DME and/or compression devices over a two-day span, from three different companies, amounting to $5,019.62 in total charges. Specifically, on January 16, 2019, Defendant Protechmed billed claimant for a pneumatic compressor nonsegmental device in the amount of $531.06 and a nonsegmental pneumatic appliance with pneumatic compressor for $89.56. On that same date, Defendant Unicast billed Plaintiffs for a prothermo ambulatory cold compression at $283.00 and a pneumatic appliance at $56.00. On January 17, 2019, the very next day, Defendant EZ Triboro Services billed Plaintiffs for a pneumatic compression device in the amount of $1,680.00, rented for a twenty-one day period, and for a CPM for the shoulder in the amount of $2,380.00, rented for a twenty-eight day period.

- In connection with claims submitted on behalf of Claimant KSK, claim number 0522411651-01, Plaintiffs were billed for pieces of DME and/or compression devices in a three-day span, from three companies, amounting to $6,582.68 in total charges. Specifically, on January 7, 2019, Defendant Protechmed billed Plaintiffs for a pneumatic compressor nonsegmental device at a cost of $531.06 and a nonsegmental pneumatic appliance with pneumatic compressor for $89.56. On that same date, Defendant Unicast billed Plaintiffs for a promothermo ambulatory cold compression device at $283.00, and a pneumatic appliance at $54.00. On January 9, 2019, two days later, Advantage Med Innovations billed Plaintiffs a cold compression/ DVT device in the amount of $2072.00, rented for a nineteen day period, and a CPM for the knee in the amount of $3,444.00, rented for a forty-two day period, a sheepskin pad at $19.50, and a nonsegmental pneumatic appliance with pneumatic compressor at $89.56.

320.   On information and belief, such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision if inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Rental Retailers.  In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose if increasing the amount of reimbursement sought from insures in general, and Plaintiffs in particular.

## 1.    Fraudulent billing of Continuous Passive Motion machines

321.   In furtherance of the scheme to defraud alleged herein, the Rental DME Owners, through their respective Rental Retailers, including but not limited to Azcare, EZ Triboro Services, and SP One Services, routinely submitted bills to Plaintiffs for Continuous Passive

Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

322.    On information and belief, as a matter of pattern, practice and protocol, the Rental DME Owners submitted to Plaintiffs, through their respective Rental Retailers, prescription forms which they knew or should have known to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CPM devices were medically necessary, when in fact, the CPM devices were provided, if at all, to financially enrich the Rental DME Owners through a fraudulent protocol of treatment.

323.    On information and belief, CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

324.    On information and belief, CPM devices have no medical utility in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

325.    On information and belief, CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long term benefit to post-operative management of patients, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334) which concluded that it is unknown whether CPM offers any benefit after shoulder surgery.  In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important effects on active knee flexion ROM, pain, function or quality of life to justify its routine use.* In addition, in study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patient randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

326.    In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

327.    CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

328.    On information and belief, notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures  such as those performed on Claimants, the Rental DME Owners, through the Rental Retailers, and pursuant to illicit kickback agreements with the HCPs, issue needless prescriptions for CPM devices to Claimants who purportedly underwent such procedures.

329.    On information and belief, notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Claimants and supplied by the Rental Retailers pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

330.    On information and belief, despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Claimants, and the lack of sufficient evidence to justify their use beyond 21 days, the Rental Retailers routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for anywhere between 4 and 6 weeks.

331.    On information and belief, although CPM units can be purchased from legitimate companies for less than the Rental Retailers' accumulated monthly charges for the particular items, the Rental Retailers systematically represent that the inexpensive CPMs dispensed to Claimants are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

332.    Specifically, the Retail Owners, through their respective Rental Retailers, including but not limited to Azcare and EZ Triboro Services routinely submitted bills to Plaintiffs for the rental of CPM devices for use on joints other than the knee at rates ranging from $85.00

to $88.00 per day per patient, using billing code E0936 resulting in total charges in amounts ranging from $2,380.00 to $3,696.00 per patient.

333.    In addition, Defendant Borukhov, through SP One Services, submitted bills to Plaintiffs for the rental of CPM devices for use on the knee in a $65.00 per day, using billing code E0935 resulting in total charges in amounts ranging from $1,820.00 to $2,730.42 per patient. Exhibit "39" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims paid by one or more Plaintiffs wherein the above-listed Rental Retailers submitted fraudulent bills for the rental of CPM Devices using billing codes E0935 and/or E0936.

334.    On information and belief, notwithstanding that the Medicare rate for a CPM is only $21.50 per day, the charges by Rental Retailers far exceed that rate, and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

335.    In addition, to avoid detection or suspicion of insurers, including Plaintiffs, the Retailers often attempt to disguise their scheme by unbundling their charges.

336.    For example, upon receipt of a prescription for the rental of CPM devices for upwards of 6 weeks, the Rental Retailers would first submit a bill for the first four weeks of the rental, and then submit a second bill for the remainder.  By way of example in connection with claim numbers 0512161183−01, 0507212421-02, 0520261298-01, 0506345222-03 and 0512907932-02, the Rental Retailers frequently unbundled their charges to disguise the total amount charged for the devices and to maximize the amount of reimbursement.

**2.      Fraudulent billing of Cold Water Circulation Units**

337.    In furtherance of the scheme to defraud alleged herein, the Rental DME Owners, through their respective Rental Retailers, including but not limited to Azcare and SP One

Services, submitted bills to Plaintiffs for Cold Water Circulation Units also known as cold therapy units ("CTUs") that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

338.    On information and belief, CTUs combine cold temperatures and compression to decrease pain, discomfort, bleeding, swelling, use of medication, length of hospital stay and/or length of recovery following injury or surgery to an extremity. The theory behind cold therapy is that by decreasing the temperature of the tissue, which produces vasoconstriction, pain is lessened, muscle spasm is decreased and inflammation is reduced.

339.    CTUs utilize pneumatic or mechanical pumps that may be battery or electrically operated, and the intended function of the pump is to provide cyclical compression and cooling to the affected area. The purpose of the compression is to remove fluid and decrease edema while providing the cooling. The devices generally consist of two basic parts: a wrap or wrap system designed to cover specific areas of the body, and a control unit or pump, which is filled with ice and/or water. The control unit or pump circulates the cooled water through the wrap system to the affected area

340.    On information and belief, CTUs have been found to be useful for post-operative care of joint reconstruction surgeries in the 3-4 days immediately following surgery.

341.    On information and belief, as a matter of pattern, practice and protocol, the Rental DME Owners submitted to Plaintiffs, through their respective Rental Retailers, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CTUs were medically necessary, when in fact, the CTUs were provided, if at all, to financially enrich the Retail Owners through a fraudulent protocol of treatment.

342.     Specifically, notwithstanding that CTUs are only medically necessary, if at all useful, for post-operative care of joint reconstruction surgeries, the Rental DME Owners, through the Rental Retailers, and pursuant to illicit kickback agreements with the HCPs, routinely issued prescriptions for CTUs for patients that underwent basic joint procedures and/or did not have any surgery whatsoever.

343.     On information and belief, while CTUs are dispensed to reduce pain, swelling and inflammation, numerous studies have concluded that they are no more effective than standard ice therapy including the application of ice packs and compression.

344.     For instance, in a study published in the January 2008 Journal of Knee Surgery, the researchers compared postoperative pain control after knee arthroscopy in 53 patients with use of a CTU device compared with a traditional ice therapy regimen, and found that though pain intensity was similar between groups throughout the course of the study, there were no significant differences found in the groups regarding functional ability.

345.     In addition, in a systematic review of the literature concerning the use of cryotherapy in acute soft tissue injury published in the July 2001 edition of the International Journal of Sports Medicine, the review concluded that the optimal method of ice application is wet ice applied directly to the skin through a wet towel and that the target temperature reduction is to 10-15 °C.

346.     Furthermore, in a study following 110 patients to assess the effectiveness of postoperative cold therapy after ACL reconstructions, published in the September-October 1996 American Journal of Sports Medicine, the review concluded that ice bags and cooling pads appeared equally effective.

347.    In addition to these studies, on June 9, 2019, the Center for Medicare and Medicaid Studies ("CMS") issued a Local Coverage Determination—No. L33735—in which it concluded that active cold therapy units were not medically necessary due to the availability of alternate therapy, such as traditional cold-pack application, which produce the same therapeutic outcome.

348.    On information and belief, even when CTUs are medically useful, they should be used for no more than three to four days immediately following surgery.

349.    Despite the fact that CTUs are not medically necessary, the Rental Retailers routinely filled prescriptions systematically provided by the HCPs for the devices to be used for anywhere between 2 and 4 weeks.

350.    On information and belief, the Rental Retailers obtained these prescriptions pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between themselves and the No-fault Clinics at which the HCPs were employed.

351.    Although the CTUs can be purchased from legitimate companies for less than the Retailers' accumulated monthly charges for the particular items, the Rental Retailers systematically represent that the inexpensive CTUs dispensed to Claimants are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

352.    Specifically, the Rental DME Owners, through their respective Rental Retailers, including but not limited to Azcare and SP One Services, routinely submitted bills to Plaintiffs for the rental of CTUs devices at rates ranging from $42.89 to $52.88 per day per patient, using billing codes E0217 and/or E0236, resulting in total charges in amounts ranging from $600.00 to $2,220.00 per patient.  Exhibit "40" in the accompanying Compendium of Exhibits is a

spreadsheet containing a representative sample of claims paid by one or more Plaintiffs wherein the above-listed Rental Retailers submitted fraudulent bills for the rental of CTU devices.

353.   On information and belief, the same CTUs rented by the Rental Retailers are available for purchase from other Rental Retailers for as little as $150.00.

**3.       Fraudulent billing of Pneumatic Compression devices**

354.   In furtherance of the scheme to defraud alleged herein, the Rental DME Owners, through their respective Rental Retailers, including but not limited to Protechmed, EZ Triboro, Unicast and YBD Universal routinely submitted bills to Plaintiffs for Pneumatic Compression devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

355.   On information and belief, each of the Claimants that receive Pneumatic Compression devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0514568179-01, 0429272008-02, and 0499943321-04, none of the Claimants were involved in major car accidents that resulted in significant injury or hospitalization.

356.   On information and belief, shortly after the accident, each of the Claimants visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Claimants for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME.

357.   On information and belief, after the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, the patients are referred for surgical

procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

358.   On information and belief, while at the ASC, the Claimants are purportedly provided with Pneumatic Compression devices post-surgery.

359.   On information and belief, a Pneumatic Compression device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. There are three primary types of compression devices. A non-segmented pneumatic compressor, which was billed for by the Defendants, is a device that consists of a single chamber that is inflated at one time and that applies uniform pressure.

360.   On information and belief, a Pneumatic Compression device is used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

361.   On information and belief, the use of Pneumatic Compression devices are rarely indicated in the types of procedures performed on the Claimants to prevent limb edema.  In almost all cases, the prevention and/or alleviation of post-surgical edema can be done simply by using simple cold packs, compressive bandages, and elevation of the limb.

362.   On information and belief, the standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated.

363.     On information and belief, the bills submitted by the Rental Retailers misrepresent that devices are given to the Claimants to take home, to the extent they are provided to the Claimants at all. The Rental Retailers bill for the full amount allowable for the provision of such items under the Fee Schedule, notwithstanding that the Claimants do not take the items home.  In that regard, the Claimants do not receive the devices; rather, the Retail Retailers keep the devices and use them time and again on several patients to maximize profits.  By way of example and not limitation, in connection with claim numbers 0507675171-01, 0507675171-02, 0505515007-01, and 0530482215, bills were submitted by Rental Retailers Protechmed and Unicast for Pneumatic Compression devices purportedly supplied to the Claimants, but the Claimants confirmed during Examinations Under Oath that the devices remained at the ASC after the surgery and/or that they did not receive the billed for items.

364.     On information and belief, in many instances, the forms given to the patient used to support the Rental Retailers claims are signed in blank and/or the Claimants signature are photocopied by the providers for use by the Rental Retailers to obtain reimbursement for services that were not provided and/or not provided as billed.  By way of example and not limitation, in connection with claim numbers 0514568179-01, 0530494913, 0529099557, 0534635677, 0545721433, and 0532015245, Rental Retailers Protechmed and Unicast submitted patient AOBs where the Claimants signature had been photocopied and/or forged.

365.     On information and belief, as a matter of pattern, practice and protocol, the Rental DME Owners submitted to Plaintiffs, through their respective Rental Retailers, prescription forms which they knew or should have known to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that Pneumatic Compression devices that were medically necessary, when in fact, the Pneumatic Compression devices were provided, if at all, to financially

enrich the Rental DME Owners through a fraudulent protocol of treatment.  By way of example and not limitation, in connection with claim numbers 0517720982-02, 0514858018-01, 0508352788-02, 0519495443-02, 0487961294-02, 0471578849-04, 0511736654-01 and 0499943321-04, the prescriptions for the Pneumatic Compression devices submitted for each of the Claimants in support of claims for reimbursement were photocopied and/or duplicated.

366.    On information and belief, the Rental Retailers, Protechmed and Unicast in particular, often prescribe similar Pneumatic Compression devices on the same day, for the same Claimants, purportedly supplied to the Claimants at the ASC. In some cases, as part of a fraudulent protocol to maximize reimbursement, Claimants receive as many as three different compression devices within a few short weeks of each other.  By way of example and not limitation, in connection with claim numbers 0508352788-02, 0517720982-02, 0519495443-02, Protechmed and Unicast billed for similar Pneumatic Compression devices on the same day, for the same Claimants.  Following the billing for the devices at the ASC, in connection with claim numbers 0508352788-02, 0517720982-02, and 0519495443-02, the Claimants purportedly received an additional compression device, supplied by Rental Retailer EZ Triboro, provided to the Claimants on rental basis for periods of 14 to 28 days.

367.    By way of example and not limitation, Exhibit "41" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for pneumatic compression devices billed under code E0650, E0676, and/or E1399 in amounts ranging from $283.00 for a single day rental to $1,680.00 for a 21 day rental, and accompanying appliances under codes E0655, E0656, E0666, E0668, E0673, E0686, and E0688 in amounts ranging from $54.00 to $89.56.

368.     Separate and apart from the excessive billing of compression devices post-surgery, Defendant YBD Universal, as part of a pattern, practice and protocol, routinely billed for medically unnecessary compression and cold therapy Game Ready brand devices in instances where the claimant did not have surgery.

369.     On information and belief, similar to the fraudulent billing of the other compression units, in exchange for a kickback and/or other financial compensation, the referring HCPs routinely prescribe the Game Ready devices using pre-printed, formulaic prescription forms that contain stock medical necessity language with broad and unsupported statements that the device is medically necessary to "reduce unnecessary suffering and delays," "reduce recovery time" and "reduce swelling, edema and pain." Notwithstanding the unsupported benefits in the pre-printed form, in many cases the same results can be accomplished by more inexpensive means in almost all cases simply by using simple cold packs, compressive bandages, and elevation of the limb.

370.     On information and belief, in numerous cases, the prescriptions from the referring providers are fabrications and the doctors' signatures have been duplicated and/or photocopied as part of the scheme to maximize reimbursement through these medically unnecessary items.

371.     In many instances, these medically unnecessary units are prescribed by the same referring HCP, operating out of the same No-fault Clinics and are often prescribed with one or more of other rental DME devices such as SAM Units. Each of these devices are typically rented to the Claimants for a period of three to six weeks within a month of each other as part of the fraudulent scheme to maximize reimbursement.

372.     By way of example and not limitation, Defendants Davydov and Yagudaev, through YBD Universal, routinely submitted bills to Plaintiffs for Game Ready compression

devices under code E1399 in amounts up to and including $1,890.00, which were not provided as billed, if any were provided at all and were supplied pursuant to fraudulent protocol of treatment. By way of example and not limitation, Exhibit "42" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs for Game Ready compression devices submitted under code E1399 at a rate of $70/day in amounts ranging from $1,470.00 to $1,890.00, and accompanying appliances submitted under code E1399 at a rate of $10.00/day in amounts ranging from $140.00 to $210.00.

**4.        Fraudulent billing of Sustained Acoustic Medicine Devices**

373.    In furtherance of the scheme to defraud alleged herein, the Rental DME Owners, through their respective Rental Retailers, including but not limited to EZ Triboro Services, iSupply Medical, MetaMed Sports & Supply, New Capital 1, SP One Services, and YBD Universal, routinely submitted bills to Plaintiffs for Sustained Acoustic Medicine ("SAM") devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

374.    On information and belief, the SAM device is a battery powered, wearable and portable device that purports to produce ultrasound at a frequency of 3 megahertz in order to provide heat related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two to six week period.

375.    On information and belief, notwithstanding its intended use, the ultrasound purportedly provided by the SAM device is insufficient to produce clinically effective heating. For example, the strength of the ultrasound in the SAM device is listed at 0.00132

Watts/centimeter which is about a thousand times weaker than standard ultrasound that is used clinically in physical therapy.

376.     Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for SAM devices for patients that have underwent outpatient arthroscopic surgical procedures to patients that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, along with a host of other expensive rental DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medical unnecessary treatments.

377.     On information and belief, the heating pattern of the SAM device is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP.  For example, the ultrasound purportedly provided by the SAM device only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles.

378.     On information and belief, the SAM devices are often prescribed with one or more other rental DME devices such as CPMs, CTUs, and/or pneumatic compression devices.  Each of these devices are typically rented to the Claimants for a period of three to eight weeks within a few days of the patients' surgery.

379.     On information and belief, the prescriptions for the SAM devices are never given to the patients.  Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Rental DME provider in exchange for a kickback and or other financial incentive or compensation.

380.     On information and belief, in numerous cases, the prescriptions from the referring providers are fabrications and the doctors' signatures have been duplicated and/or photocopied as

part of the scheme to maximize reimbursement through these medically unnecessary rental items and the SAM devices in particular.

381.    Upon receipt of the prescriptions for the SAM devices, the Rental Retailers submit bills to insurers in amounts of $840.00 to $3,683.12, charging daily rental rate for the items from $60.00 to $69.95 per day for periods spanning two (2) to eight (8) weeks regardless of actual patient need in order to maximize reimbursement.

382.    To avoid any suspicions concerning the inflated charges, the Rental Retailers often unbundle the charges, splitting bills up into fourteen (14) or twenty-one (21) day periods to disguise the total amount of the charge.

383.    On information and belief, oftentimes, the devices are delivered to the patients without the patients' knowledge that they were going to receive the device.  Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to the patients.  In many cases and as a result, the patients do not use the device and/or use the device improperly posing a risk to the patients' health as well rendering the device ineffective.

384.    By way of example and not limitation, the Retail Owners, through their respective Retailers EZ Triboro Services, iSupply Medical, MetaMed Sports & Supply, New Capital 1, SP One Services, and YBD Universal routinely submitted bills to Plaintiffs for SAM devices under code E1399 in amounts up to and including $2,937.90, which were not provided as billed, if any were provided at all, and were supplied pursuant to fraudulent protocol of treatment. By way of example and not limitation, Exhibit "43" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Rental Retailers submitted fraudulent bills for SAM devices under codes E1399 and/or E1399 RR at

daily rental rates ranging from $58.00/day to $69.95/day in amounts ranging from $840.00 to $2,937.90, and accompanying coupling patches billed under code 1399 CP for $126.00.

## MONEY LAUNDERING SCHEME

385.    Defendants knew that the money paid by insurers, in general, and Plaintiffs, in particular, to the Retailers represented the proceeds and profits of their unlawful activity.

386.    To ensure that they would ultimately receive their ill-gotten gains, on information and belief, one or more of the Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

387.    These covert transactions were facilitated through various clandestine arrangements among one or more of the Retail Defendants, Wholesalers, check brokers (who acted as intermediaries between the check cashers and the Retail and Wholesalers in order to conceal the true beneficiaries of the transactions) and check cashers.

388.    As described herein, on information and belief, the Defendant Retailers and Defendant Wholesalers generated significant amounts of cash through transactions with check cashers and/or other financial arrangements.  This cash was used to facilitate, among other things: (i) the secret cash kickback arrangements between the Defendant Retailers and Wholesalers that were essential to foster the illusion that the Retailers actually paid the inflated amounts for DME and/or orthotic devices reflected on the wholesale invoices; (ii) the secret cash kickback arrangements between the Defendant Retailers and No-fault Clinics, which were necessary to induce the clinics to supply the Defendant Retailers with prescriptions for bogus DME and/or orthotic devices; and (iii) the Defendant Retailers' and Defendant Wholesalers' transactions, which were intentionally disguised as business expenses in order evade corporate tax liabilities through false deductions and/or the under reporting of income, thereby maximizing the

Defendants' profits from, and enhancing their incentives to continue, the fraudulent activities described herein.

389.   As part of the scheme, one or more of the Defendants routinely presented numerous checks to check cashers that were structured in amounts slightly under the $10,000 floor that would have triggered compulsory reporting to the government.  These checks were: (i) payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; (ii) payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or (iii) presented by "brokers" who acted as intermediaries between the check cashers, Retailers and Wholesalers in order to conceal the true beneficiaries of the transactions.

390.   On information and belief, in exchange for a nominal fee, nearly all of the cash generated by the check cashing transactions involving the Wholesalers was returned to the Retailers.  In particular, in furtherance of the scheme to defraud, to create the illusion that the Retailers paid the grossly inflated prices on the invoices provided by the Wholesalers, the Retailers issued checks to the Wholesalers, among others, for the full amounts reflected on the wholesale invoice(s).  The Retailers used those checks to demonstrate to Plaintiffs, and others, that they paid the false wholesale invoice amounts and used the returned cash to pay kickbacks to, among others, the clinics that issued fraudulent and/or forged prescriptions for DME.

391.   In reality, on information and belief, the Wholesalers converted the checks they received from the Retailers to cash and secretly returned cash to the Retailers up to 98% of the wholesale invoice amounts.

392.   Through these transactions, the Retailers were able to surreptitiously obtain cash, which in turn would be used to, among other things, pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices, and to the Wholesalers in exchange

for inflated wholesale invoices, thereby maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

## DISCOVERY OF THE FRAUD

393.    To induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- The Retail Owners, through their respective Retailers, routinely and deliberately: (i) failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that the Retailers actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (ii) submitted fraudulent wholesale invoices from one or more of the Wholesalers, reflecting prices far in excess of those actually paid by the Retailers, to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, the Retail Owners, through their respective Retailers, routinely misrepresented in the bills submitted to Plaintiffs that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- The Retail Owners, through their respective Retailers, submitted false delivery receipts in support of their bills that purported to demonstrate the No-fault Claimants' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the No-fault Claimants signed them, or, in some instances, they contained forged signatures;

- The Retail Owners, through their respective Retailers, systematically failed and/or refused to provide Plaintiffs with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Claimants, and/or additional information necessary to determine whether the charges submitted by the Retailers were legitimate.

394.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent

concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $1,200,000.00 based upon the fraudulent bill submissions.

395.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS KHARISOVA, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

396.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

397.    At all times relevant herein, AK Global Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

398.    From, in or about June 18, 2018 through the date of the filing of this Complaint, Defendant Kharisova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the AK Global Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

399.     At all relevant times mentioned herein, Defendant Kharisova, together with others unknown to Plaintiffs, exerted control over and directed the operations of the AK Global Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

400.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Kharisova required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

401.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

402.     The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half period, were related and similar and were committed as part of the ongoing scheme of Defendants Kharisova, one or more of the ABC Corporations 1 through 20, and one or

more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

403.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as AK Global Supply continues to pursue collection on the fraudulent billing to the present day.

404.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Kharisova, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the AK Global Supply enterprise based upon materially false and misleading information.

405.    Through the AK Global Supply enterprise, Defendant Kharisova submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Kharisova, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Kharisova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the AK Global Supply enterprise through the filing of this Complaint.

406.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Kharisova

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

407.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

408.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

409.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $64,000.00, the exact amount to be determined at trial.

410.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Kharisova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS AK GLOBAL SUPPLY AND KHARISOVA

### (Common Law Fraud)

411.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

412.    Defendants AK Global Supply and Kharisova made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance

Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

413. On information and belief, each and every bill and supporting documentation submitted by Defendants AK Global Supply and Kharisova to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

414. On information and belief, Defendants AK Global Supply and Kharisova intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts AK Global Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- • False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Kharisova, through AK Global Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Kharisova through AK Global Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

415.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant AK Global Supply claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

416.    Defendants AK Global Supply and Kharisova knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

417.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants AK Global Supply and Kharisova.

418.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant AK Global Supply's claims for No-fault insurance benefits submitted in connection therewith.

419.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants AK Global Supply and Kharisova evinces a high degree of moral turpitude and wanton dishonesty,

which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

420.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $64,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS AK GLOBAL SUPPLY AND KHARISOVA

### (Unjust Enrichment)

421.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

422.     By reason of their wrongdoing, Defendants AK Global Supply and Kharisova have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

423.     Plaintiffs are therefore entitled to restitution from Defendants AK Global Supply and Kharisova in the amount by which it has been unjustly enriched.

424.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and

property in an amount as yet to be determined, but believed to be in excess of $64,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

#### (Aiding and Abetting)

425.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

426.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants AK Global Supply and Kharisova.

427.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants AK Global Supply and Kharisova purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants AK Global Supply and Kharisova could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Kharisova through AK Global Supply to AK Global Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to

constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through AK Global Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Kharisova, through AK Global Supply, and the No-fault Clinics.

428.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants AK Global Supply and Kharisova to obtain fraudulently inflated payments from Plaintiffs, among others.

429.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

430.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through AK Global Supply in an amount to be determined at trial, but in no event less than $64,000.00.

431.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

432.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

### FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ZAKHAROVA, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

433.     The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

434.     At all times relevant herein, Azcare was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

435.     From, in or about February 14, 2018 through the date of the filing of this Complaint, Defendant Zakharova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Azcare enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

436.    At all relevant times mentioned herein, Defendant Zakharova together with others unknown to Plaintiffs, exerted control over and directed the operations of the Azcare enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

437.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Zakharova required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

438.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

439.    The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half period, were related and similar and were committed as part of the ongoing scheme of Defendants Zakharova, one or more of the ABC Corporations 1 through 20 and one or

more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

440.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Azcare continues to pursue collection on the fraudulent billing to the present day.

441.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Zakharova, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Azcare enterprise based upon materially false and misleading information.

442.    Through the Azcare enterprise, Defendant Zakharova submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Zakharova, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Zakharova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Azcare enterprise through the filing of this Complaint.

443.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant

Zakharova, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

444.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

445.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

446.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $30,000, the exact amount to be determined at trial.

447.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Zakharova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS AZCARE AND ZAKHAROVA**

**(Common Law Fraud)**

448.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

449.   Defendants Azcare and Zakharova made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

450.    On information and belief, each and every bill and supporting documentation submitted by Defendants Azcare and Zakharova to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

451.    On information and belief, Defendants Azcare and Zakharova intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Azcare was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Zakharova, through Azcare, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Zakharova, through Azcare, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

452.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Azcare's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

453.    Defendants Azcare and Zakharova knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

454.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Azcare and Zakharova.

455.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Azcare's claims for No-fault insurance benefits submitted in connection therewith.

456.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Azcare and Zakharova evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged

above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

457.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $30,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS AZCARE AND ZAKHAROVA

### (Unjust Enrichment)

458.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

459.    By reason of their wrongdoing, Defendants Azcare and Zakharova have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

460.    Plaintiffs are therefore entitled to restitution from Defendants Azcare and Zakharova in the amount by which they have been unjustly enriched.

461.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $30,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

462.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

463.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Azcare and Zakharova.

464.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Azcare and Zakharova purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Azcare and Zakharova could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Zakharova, through Azcare, to Azcare to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Azcare; and (v) knowingly supporting the negotiation and performance of kickback agreements between Zakharova, through Azcare, and the No-fault Clinics.

465.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Azcare and Zakharova to obtain fraudulently inflated payments from Plaintiffs, among others.

466.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

467.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Azcare in an amount to be determined at trial, but in no event less than $30,000.00.

468.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

469.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABAYEV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

470.　The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

471.　At all times relevant herein, Big Apple Med Equipment was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

472.　From, in or about November 27, 2018 through the date of the filing of this Complaint, Defendant Abayev, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Big Apple Med Equipment enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

473.　At all relevant times mentioned herein, Defendant Abayev together with others unknown to Plaintiffs, exerted control over and directed the operations of the Big Apple Med Equipment enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

126

Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

474.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Abayev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

475.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

476.    The racketeering acts set forth herein were carried out on a continued basis for more than a one year period, were related and similar and were committed as part of the ongoing scheme of Defendants Abayev, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

477.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Abayev continues to pursue collection on the fraudulent billing to the present day.

478.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Abayev with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Big Apple Med Equipment enterprise based upon materially false and misleading information.

479.    Through the Big Apple Med Equipment enterprise, Defendant Abayev submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Abayev, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Abayev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Big Apple Med Equipment enterprise through the filing of this Complaint.

480.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Abayev in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

481.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

482.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

483.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $37,000.00, the exact amount to be determined at trial.

484.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Abayev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**TENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANTS BIG APPLE MED EQUIPMENT AND ABAYEV**

**(Common Law Fraud)**

485.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

486.    Defendants Big Apple Med Equipment and Abayev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

487.    On information and belief, each and every bill and supporting documentation submitted by Defendants Big Apple Med Equipment and Abayev to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly

supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

488.   On information and belief, Defendants Big Apple Med Equipment and Abayev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Big Apple Med Equipment was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Abayev, through Big Apple Med Equipment, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on

the prescriptions, all of which was designed to permit Defendant Abayev, through Big Apple Med Equipment, to manipulate the payment formulas and its claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

489.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants Big Apple Med Equipment's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

490.    Defendants Big Apple Med Equipment and Abayev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

491.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Big Apple Med Equipment and Abayev.

492.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Big Apple Med Equipment's claims for No-fault insurance benefits submitted in connection therewith.

493.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Big Apple Med Equipment and Abayev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

494.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $38,000.00, the

exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## ELEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS BIG APPLE MED EQUIPMENT AND ABAYEV

### (Unjust Enrichment)

495.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

496.     By reason of their wrongdoing, Defendants Big Apple Med Equipment and Abayev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

497.     Plaintiffs are therefore entitled to restitution from Defendants Big Apple Med Equipment and Abayev in the amount by which they have been unjustly enriched.

498.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $38,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWELFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

499.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

500.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Big Apple Med Equipment and Abayev.

501.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Big Apple Med Equipment and Abayev purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Big Apple Med Equipment and Abayev could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Abayev, through Big Apple Med Equipment, to Big Apple Med Equipment to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others,

133

through Big Apple Med Equipment and (v) knowingly supporting the negotiation and performance of kickback agreements between Abayev, through Big Apple Med Equipment, and the No-fault Clinics.

502.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Big Apple Med Equipment and Abayev to obtain fraudulently inflated payments from Plaintiffs, among others.

503.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

504.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Big Apple Med Equipment in an amount to be determined at trial, but in no event less than $38,000.00.

505.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

506.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## THIRTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS KHAITOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

507.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

508.    At all times relevant herein, Central Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

509.    From, in or about November 29, 2017 through the date of the filing of this Complaint, Defendant Khaitov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Central Supplies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

510.    At all relevant times mentioned herein, Defendant Khaitov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Central Supplies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted

135

of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

511.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Khaitov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

512.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

513.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Khaitov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

514.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Central Supplies continues to pursue collection on the fraudulent billing to the present day.

515.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Khaitov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Central Supplies enterprise based upon materially false and misleading information.

516.    Through the Central Supplies enterprise, Defendant Khaitov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Khaitov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Khaitov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Central Supplies enterprise through the filing of this Complaint.

517.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Khaitov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

518.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

519.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

520.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $21,000.00, the exact amount to be determined at trial.

521.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Khaitov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### FOURTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS CENTRAL SUPPLIES AND KHAITOV

### (Common Law Fraud)

522.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

523.     Defendants Central Supplies and Khaitov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

524.     On information and belief, each and every bill and supporting documentation submitted by Defendants Central Supplies and Khaitov to Plaintiffs set forth false and fraudulent

amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

525.    On information and belief, Defendants Central Supplies and Khaitov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Central Supplies was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendants Khaitov through Central Supplies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions,

all of which was designed to permit Defendant Khaitov through Central Supplies to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

526.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Central Supplies's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

527.    Defendants Central Supplies and Khaitov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

528.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Central Supplies and Khaitov.

529.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Central Supplies's claims for No-fault insurance benefits submitted in connection therewith.

530.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Central Supplies and Khaitov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

531.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of

$21,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS CENTRAL SUPPLIES AND KHAITOV

### (Unjust Enrichment)

532.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

533.     By reason of their wrongdoing, Defendants Central Supplies and Khaitov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

534.     Plaintiffs are therefore entitled to restitution from Defendants Central Supplies and Khaitov in the amount by which they have been unjustly enriched.

535.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $21,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

536.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

537.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Central Supplies and Khaitov.

538.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Central Supplies and Khaitov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Central Supplies and Khaitov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Khaitov, through Central Supplies to Central Supplies to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Central Supplies; and (v) knowingly supporting the negotiation and performance of kickback agreements between Khaitov, through Central Supplies, and the No-fault Clinics.

539.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no

opportunity for Defendants Central Supplies and Khaitov to obtain fraudulently inflated payments from Plaintiffs, among others.

540.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

541.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Central Supplies in an amount to be determined at trial, but in no event less than $21,000.00.

542.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

543.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS RUBINOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

544.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

545.    At all times relevant herein, EZ Triboro Services was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

546.    From, in or about February 16, 2018 through the date of the filing of this Complaint, Defendant Rubinov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the EZ Triboro Services enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

547.    At all relevant times mentioned herein, Defendant Rubinov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

548.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Rubinov required, in

furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

549.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

550.    The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half period, were related and similar and were committed as part of the ongoing scheme of Defendants Rubinov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

551.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as EZ Triboro Services continues to pursue collection on the fraudulent billing to the present day.

552.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Rubinov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the EZ Triboro Services enterprise based upon materially false and misleading information.

553.    Through the EZ Triboro Services enterprise, Defendant Rubinov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Rubinov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Rubinov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the EZ Triboro Services enterprise through the filing of this Complaint.

554.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Rubinov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

555.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

556.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

557.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company, have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $60,000.00, the exact amount to be determined at trial.

558.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Rubinov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**EIGHTEENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS EZ TRIBORO SERVICES AND RUBINOV**

**(Common Law Fraud)**

559.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

560.    Defendants EZ Triboro Services and Rubinov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

561.    On information and belief, each and every bill and supporting documentation submitted by Defendants EZ Triboro Services and Rubinov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

562.    On information and belief, Defendants EZ Triboro Services and Rubinov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts,

including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts EZ Triboro Services was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Rubinov, through EZ Triboro Services, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Rubinov, through EZ Triboro

Services, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

563.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant EZ Triboro Services' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

564.     Defendants EZ Triboro Services and Rubinov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

565.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants EZ Triboro Services and Rubinov.

566.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant EZ Triboro Services' claims for No-fault insurance benefits submitted in connection therewith.

567.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants EZ Triboro Services and Rubinov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

568.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as

yet to be determined, but believed to be in excess of $61,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINETEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EZ TRIBORO SERVICES AND RUBINOV

### (Unjust Enrichment)

569.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

570.    By reason of their wrongdoing, Defendants EZ Triboro Services and Rubinov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

571.    Plaintiffs are therefore entitled to restitution from Defendants EZ Triboro Services and Rubinov in the amount by which it has been unjustly enriched.

572.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $61,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

573.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

574.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants EZ Triboro Services and Rubinov.

575.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants EZ Triboro Services and Rubinov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants EZ Triboro Services and Rubinov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Rubinov, through EZ Triboro Services, to EZ Triboro Services to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through EZ Triboro

Services; and (v) knowingly supporting the negotiation and performance of kickback agreements between Rubinov, through EZ Triboro Services, and the No-fault Clinics.

576. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants EZ Triboro Services and Rubinov to obtain fraudulently inflated payments from Plaintiffs, among others.

577. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

578. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through EZ Triboro Services in an amount to be determined at trial, but in no event less than $61,000.00.

579. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

580.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### TWENTY-FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS SHIMONOV, SOROKIN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

581.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

582.    At all times relevant herein, Five Borough Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

583.    From, in or about March 6, 2018 through the date of the filing of this Complaint, Defendants Shimonov, Sorokin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Five Borough Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

584.    At all relevant times mentioned herein, Defendants Shimonov and Sorokin, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Five Borough Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty

Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

585.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendants Shimonov and Sorokin required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

586.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

587.    The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half period, were related and similar and were committed as part of the ongoing scheme of Defendants Shimonov, Sorokin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

588.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Five Borough Supply continues to pursue collection on the fraudulent billing to the present day.

589.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Shimonov and Sorokin, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Five Borough Supply enterprise based upon materially false and misleading information.

590.    Through the Five Borough Supply enterprise, Defendants Shimonov and Sorokin submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendants Shimonov and Sorokin, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Shimonov and Sorokin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Five Borough Supply enterprise through the filing of this Complaint.

591.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Shimonov and Sorokin, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

592. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

593. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

594. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $7,900.00, the exact amount to be determined at trial.

595. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shimonov and Sorokin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### TWENTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS FIVE BOROUGH SUPPLY, SHIMONOV AND SOROKIN

### (Common Law Fraud)

596. The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

597. Defendants Five Borough Supply, Shimonov and Sorokin made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

598.    On information and belief, each and every bill and supporting documentation submitted by Defendants Five Borough Supply, Shimonov and Sorokin to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

599.    On information and belief, Defendants Five Borough Supply, Shimonov and Sorokin intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Five Borough Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby,

Defendants Shimonov and Sorokin, through Five Borough Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendants Shimonov and Sorokin, through Five Borough Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

600.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Five Borough Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

601.    Defendants Five Borough Supply, Shimonov and Sorokin knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

602.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Five Borough Supply, Shimonov and Sorokin.

603.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Five Borough Supply's claims for No-fault insurance benefits submitted in connection therewith.

604.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Five Borough Supply, Shimonov and Sorokin evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

605.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $9,100.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS FIVE BOROUGH SUPPLY AND SHIMONOV AND SOROKIN

### (Unjust Enrichment)

606.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

607.     By reason of their wrongdoing, Defendants Five Borough Supply, Shimonov and Sorokin have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

608.     Plaintiffs are therefore entitled to restitution from Defendants Five Borough Supply, Shimonov and Sorokin in the amount by which it has been unjustly enriched.

609.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and

property in an amount as yet to be determined, but believed to be in excess of $9,100.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**TWENTY-FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

**(Aiding and Abetting)**

610.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

611.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Five Borough Supply, Shimonov and Sorokin.

612.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Five Borough Supply, Shimonov and Sorokin purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Five Borough Supply, Shimonov and Sorokin could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Shimonov and Sorokin, through Five Borough Supply, to Five Borough Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally

160

inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Five Borough Supply and (v) knowingly supporting the negotiation and performance of kickback agreements between Shimonov and Sorokin, through Five Borough Supply, and the No-fault Clinics.

613.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Five Borough Supply, Shimonov and Sorokin to obtain fraudulently inflated payments from Plaintiffs, among others.

614.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

615.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Five Borough Supply in an amount to be determined at trial, but in no event less than $9,100.00.

616.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

617.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### TWENTY-FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS LEVIT, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

618.     The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

619.     At all times relevant herein, Frontline Fitters Surgical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

620.     From, in or about February 22, 2017 through the date of the filing of this Complaint, Defendants Levit, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

621.   At all relevant times mentioned herein, Defendant Levit, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Frontline Fitters Surgical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

622.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Levit required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

623.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

624.   The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Levit, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

625.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Frontline Fitters Surgical Supply continues to pursue collection on the fraudulent billing to the present day.

626.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Levit, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Frontline Fitters Surgical Supply enterprise based upon materially false and misleading information.

627.    Through the Frontline Fitters Surgical Supply enterprise, Defendant Levit submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Levit, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Levit, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Frontline Fitters Surgical Supply enterprise through the filing of this Complaint.

628.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Levit, in

furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

629.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

630.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

631.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $77,000.00, the exact amount to be determined at trial.

632.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Levit, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**TWENTY-SIXTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS LEVIT AND FRONTLINE FITTERS SURGICAL SUPPLY**

**(Common Law Fraud)**

633.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

634.    Defendants Frontline Fitters Surgical Supply and Levit made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

635. On information and belief, each and every bill and supporting documentation submitted by Defendants Frontline Fitters Surgical Supply and Levit to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

636. On information and belief, Defendants Frontline Fitters Surgical Supply and Levit intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Frontline Fitters Surgical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Levit, through Frontline Fitters Surgical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Levit, through Frontline Fitters Surgical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

637.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Frontline Fitters Surgical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

638.    Defendants Frontline Fitters Surgical Supply and Levit knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

639.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Frontline Fitters Surgical Supply and Levit.

640.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Frontline Fitters Surgical Supply's claims for No-fault insurance benefits submitted in connection therewith.

641.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Frontline Fitters Surgical Supply and Levit evinces a high degree of moral turpitude and wanton

dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

642.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $77,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS FRONTLINE FITTERS SURGICAL SUPPLY AND LEVIT

### (Unjust Enrichment)

643.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

644.     By reason of their wrongdoing, Defendants Frontline Fitters Surgical Supply and Levit have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

645.     Plaintiffs are therefore entitled to restitution from Defendants Frontline Fitters Surgical Supply and Levit in the amount by which they have been unjustly enriched.

646.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and

property in an amount as yet to be determined, but believed to be in excess of $77,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### TWENTY-EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

647.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

648.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Frontline Fitters Surgical Supply and Levit.

649.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Frontline Fitters Surgical Supply and Levit purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Frontline Fitters Surgical Supply and Levit could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Levit, through Frontline Fitters Surgical Supply, to Frontline Fitters Surgical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally

inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Frontline Fitters Surgical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Levit, through Frontline Fitters Surgical Supply, and the No-fault Clinics.

650. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Frontline Fitters Surgical Supply and Levit to obtain fraudulently inflated payments from Plaintiffs, among others.

651. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

652. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Frontline Fitters Surgical Supply in an amount to be determined at trial, but in no event less than $77,000.00.

653.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

654.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### TWENTY-NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANT YAKUBOV

### (RICO, pursuant to 18 U.S.C. § 1962(c))

655.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

656.    At all times relevant herein, Health Choice Pharmacy was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

657.    From, in or about November 4, 2014, through the date of the filing of this Complaint, Defendant Yakubov knowingly conducted and participated in the affairs of the Health Choice Pharmacy enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

658.    At all relevant times mentioned herein, Defendant Yakubov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Health Choice

Pharmacy enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company, seeking payment for fraudulently prescribed Compound Pain Creams that were (1) medical unnecessary and the product of a predetermined protocol designed to maximize the reimbursement in furtherance of the scheme to defraud without regard to the No-fault Claimants' medical needs; (2) prescribed and dispensed in exahnge for, unlawful kickbakcs and/or other financial arrangements with the Prescribing No-fault Clinics; and (3) prescribed and dispensed in pre-determined/set formulations that were not tailored to any specific patient need in violation of Federal and New York State laws and regualtions.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

659.     The racketeering acts set forth herein were carried out on a continued basis for more than a five-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Yakubov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for Compound Pain Creams to defraud insurers, and, if not stopped, such acts will continue into the future.

660.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Health Choice Pharmacy continues to pursue collection on the fraudulent billing to the present day.

661.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Yakubov, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made

in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Health Choice Pharmacy enterprise based upon materially false and misleading information.

662.    Through the Health Choice Pharmacy enterprise, Defendant Yakubov submitted numerous fraudulent claim forms seeking payment for Compound Pain Creams that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Yakubov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Yakubov engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Health Choice Pharmacy enterprise through the filing of this Complaint.

663.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Yakubov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

664.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

665.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

666.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have

been damaged in the aggregate amount presently in excess of $111,000.00, the exact amount to be determined at trial.

667.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendant Yakubov, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS HEALTH CHOICE PHARMACY AND YAKUBOV

## (Common Law Fraud)

668.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

669.     Defendants Health Choice Pharmacy and Yakubov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

670.     On information and belief, each and every bill and supporting documentation submitted by Defendants Health Choice Pharmacy and Yakubov to Plaintiffs set forth false and fraudulent amounts for reimbursement for Compound Pain Creams that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

671.     On information and belief, Defendants Health Choice Pharmacy and Yakubov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts,

including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements that Compound Pain Creams were medically necessary when the prescriptions were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants;

- False and misleading statements as to the amounts Health Choice Pharmacy was entitled to be reimbursed under the No-fault Law;

- False and misleading statements concealing that the Compound Pain Creams were prescribed and dispensed in pre-determined/set formulations and in large quatities that were not tailored to any specific patient need in violation of applicable Federal and New York State regulatory requiremnts.

672.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Health Choice Pharmacy's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

673.    Defendants Health Choice Pharmacy and Yakubov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

674.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Health Choice Pharmacy and Yakubov.

675.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Health Choice Pharmacy's claims for No-fault insurance benefits submitted in connection therewith.

676. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Health Choice Pharmacy and Yakubov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

677. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $111,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS HEALTH CHOICE PHARMACY AND YAKUBOV

### (Unjust Enrichment)

678. The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

679. By reason of their wrongdoing, Defendants Health Choice Pharmacy and Yakubov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

680. Plaintiffs are therefore entitled to restitution from Defendants Health Choice Pharmacy and Yakubov in the amount by which they have been unjustly enriched.

681. By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to

be in excess of $111,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### THIRTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS GLIKMAN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

682.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

683.    At all times relevant herein, Healthy Living Medical and Surgical Products was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

684.    From, in or about September 26, 2014 through the date of the filing of this Complaint, Defendant Glikman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Healthy Living Medical and Surgical Products enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

685.    At all relevant times mentioned herein, Defendant Glikman, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Healthy Living Medical and Surgical Products enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the

fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

686. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Glikman required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

687. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

688. The racketeering acts set forth herein were carried out on a continued basis for more than a five-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Glikman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

689.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Healthy Living Medical and Surgical Products continues to pursue collection on the fraudulent billing to the present day.

690.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Glikman, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Healthy Living Medical and Surgical Products enterprise based upon materially false and misleading information.

691.    Through the Healthy Living Medical and Surgical Products enterprise, Defendant Glikman submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Glikman, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Glikman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Healthy Living Medical and Surgical Products enterprise through the filing of this Complaint.

692.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Glikman, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

693.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

694.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

695.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $32,000.00, the exact amount to be determined at trial.

696.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Glikman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRTY-THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS HEALTHY LIVING MEDICAL AND SURGICAL PRODUCTS AND GLIKMAN

### (Common Law Fraud)

697.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

698.    Defendants Healthy Living Medical and Surgical Products and Glikman made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

699.     On information and belief, each and every bill and supporting documentation submitted by Defendants Healthy Living Medical and Surgical Products and Glikman to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

700.     On information and belief, Defendants Healthy Living Medical and Surgical Products and Glikman intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Healthy Living Medical and Surgical Products was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby,

Defendant Glikman, through Healthy Living Medical and Surgical Products, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Glikman, through Healthy Living Medical and Surgical Products, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

701.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Healthy Living Medical and Surgical Products' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

702.     Defendants Healthy Living Medical and Surgical Products and Glikman knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

703.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Healthy Living Medical and Surgical Products and Glikman.

704.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Healthy Living Medical and Surgical Products' claims for No-fault insurance benefits submitted in connection therewith.

705.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Healthy Living Medical and Surgical Products and Glikman evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

706.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $34,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS HEALTHY LIVING MEDICAL AND SURGICAL PRODUCTS AND GLIKMAN

### (Unjust Enrichment)

707.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

708.    By reason of their wrongdoing, Defendants Healthy Living Medical and Surgical Products and Glikman have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

709.    Plaintiffs are therefore entitled to restitution from Defendants Healthy Living Medical and Surgical Products and Glikman in the amount by which it has been unjustly enriched.

710.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and

property in an amount as yet to be determined, but believed to be in excess of $34,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### THIRTY-FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

711.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

712.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company, by Defendants Healthy Living Medical and Surgical Products and Glikman.

713.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Healthy Living Medical and Surgical Products and Glikman purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Healthy Living Medical and Surgical Products and Glikman could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Glikman, through Healthy Living Medical and Surgical Products, to Healthy Living Medical and Surgical Products

184

to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Healthy Living Medical and Surgical Products; and (v) knowingly supporting the negotiation and performance of kickback agreements between Glikman, through Healthy Living Medical and Surgical Products, and the No-fault Clinics.

714.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Healthy Living Medical and Surgical Products and Glikman to obtain fraudulently inflated payments from Plaintiffs, among others.

715.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

716.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based

upon the fraudulent charges submitted through Healthy Living Medical and Surgical Products LLC in an amount to be determined at trial, but in no event less than $34,000.00.

717.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

718.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### THIRTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS GINDINOVA, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

719.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

720.    At all times relevant herein, Healthy Support was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

721.    From, in or about February 15, 2017 through the date of the filing of this Complaint, Defendant Gindinova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Healthy Support enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the

Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

722.    At all relevant times mentioned herein, Defendant Gindinova, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Healthy Support enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

723.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Gindinova required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

724.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

725.     The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Gindinova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

726.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Healthy Support continues to pursue collection on the fraudulent billing to the present day.

727.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Gindinova, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Healthy Support enterprise based upon materially false and misleading information.

728.     Through the Healthy Support enterprise, Defendant Gindinova submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Gindinova, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Gindinova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud,

extending from the formation of the Healthy Support enterprise through the filing of this Complaint.

729.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Gindinova, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

730.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

731.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

732.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company  have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $36,000.00, the exact amount to be determined at trial.

733.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Gindinova, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS HEALTHY SUPPORT AND GINDINOVA

### (Common Law Fraud)

734.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

735.   Defendants Healthy Support and Gindinova made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

736.   On information and belief, each and every bill and supporting documentation submitted by Defendants Healthy Support and Gindinova to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

737.   On information and belief, Defendants Healthy Support and Gindinova intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Healthy Support was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Gindinova, through Healthy Support, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Gindinova, through Healthy Support, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

738.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Healthy Support's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

739.    Defendants Healthy Support and Gindinova knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

740.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Healthy Support and Gindinova.

741.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Healthy Support's claims for No-fault insurance benefits submitted in connection therewith.

742.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Healthy Support and Gindinova evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

743.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $36,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**THIRTY-EIGHT CLAIM FOR RELIEF**

**AGAINST DEFENDANTS HEALTHY SUPPORT AND GINDINOVA**

**(Unjust Enrichment)**

744.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

745.    By reason of their wrongdoing, Defendants Healthy Support and Gindinova have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

746.     Plaintiffs are therefore entitled to restitution from Defendants Healthy Support and Gindinova in the amount by which it has been unjustly enriched.

747.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $36,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## THIRTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

748.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

749.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Healthy Support and Gindinova.

750.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Healthy Support and Gindinova purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Healthy Support and Gindinova could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Gindinova, through Healthy Support, to Healthy Support to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Healthy Support; and (v) knowingly supporting the negotiation and performance of kickback agreements between Gindinova, through Healthy Support, and the No-fault Clinics.

751.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Healthy Support and Gindinova to obtain fraudulently inflated payments from Plaintiffs, among others.

752.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

753.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Defendant Healthy Support in an amount to be determined at trial, but in no event less than $36,000.00

754.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

755.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FORTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS IBORO, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

756.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

757.    At all times relevant herein, iSupply Medical was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

758.    From, in or about March 9, 2017 through the date of the filing of this Complaint, Defendant Iboro, one or more of the ABC Corporations 1 through 20 and one or more of the John

Does 1 through 20, knowingly conducted and participated in the affairs of the enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

759.   At all relevant times mentioned herein, Defendant Iboro, together with others unknown to Plaintiffs, exerted control over and directed the operations of the iSupply Medical enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

760.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Iboro required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

761.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

762.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Iboro, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

763.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as iSupply Medical continues to pursue collection on the fraudulent billing to the present day.

764.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Iboro, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the iSupply Medical enterprise based upon materially false and misleading information.

765.    Through the iSupply Medical enterprise, Defendant Iboro submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Iboro, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those

activities, Defendants Iboro, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the iSupply Medical enterprise through the filing of this Complaint.

766.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Iboro, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

767.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

768.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

769.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $30,000.00, the exact amount to be determined at trial.

770.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Iboro, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FORTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS iSUPPLY MEDICAL AND IBORO

### (Common Law Fraud)

771.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

772.    Defendants iSupply Medical and Iboro made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

773.    On information and belief, each and every bill and supporting documentation submitted by Defendants iSupply Medical and Iboro to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

774.    On information and belief, Defendants iSupply Medical and Iboro intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts iSupply Medical was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were

the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Iboro, through iSupply Medical, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Iboro, through iSupply Medical, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

775.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant iSupply Medical's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

776.    Defendants iSupply Medical and Iboro knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

777.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants iSupply Medical and Iboro.

778.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant iSupply Medical's claims for No-fault insurance benefits submitted in connection therewith.

779.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants iSupply Medical and Iboro evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

780.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $30,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FORTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS iSUPPLY MEDICAL AND IBORO

### (Unjust Enrichment)

781.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

782.     By reason of their wrongdoing, Defendants iSupply Medical and Iboro have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

783.    Plaintiffs are therefore entitled to restitution from Defendants iSupply Medical and Iboro in the amount by which it has been unjustly enriched.

784.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $30,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

<h3 style="text-align:center">FORTY-THIRD CLAIM FOR RELIEF</h3>

<h3 style="text-align:center">AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20</h3>

<h3 style="text-align:center">(Aiding and Abetting)</h3>

785.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

786.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants iSupply Medical and Iboro.

787.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants iSupply Medical and Iboro purportedly provided to No-fault Claimants; (ii) knowingly providing

the fraudulent wholesale invoices so that Defendants iSupply Medical and Iboro could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Iboro, through iSupply Medical, to iSupply Medical to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through iSupply Medical; and (v) knowingly supporting the negotiation and performance of kickback agreements between Iboro, through iSupply Medical, and the No-fault Clinics.

788. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants iSupply Medical and Iboro to obtain fraudulently inflated payments from Plaintiffs, among others.

789. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

790. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate

Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through iSupply Medical in an amount to be determined at trial, but in no event less than $30,000.00.

791.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

792.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FORTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ANDERSON, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

793.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

794.   At all times relevant herein, Live Again Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

795.   From, in or about December 19, 2017 through the date of the filing of this Complaint, Defendant Anderson, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Live Again Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate

acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

796.     At all relevant times mentioned herein, Defendant Anderson, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Live Again Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

797.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Anderson required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

798.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

799.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-and-a-half-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Anderson, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

800.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Live Again Medical Supply continues to pursue collection on the fraudulent billing to the present day.

801.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Anderson, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Live Again Medical Supply enterprise based upon materially false and misleading information.

802.    Through the Live Again Medical Supply enterprise, Defendant Anderson submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Anderson, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Anderson, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts

of mail fraud, extending from the formation of the Live Again Medical Supply enterprise through the filing of this Complaint.

803.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Anderson, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

804.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

805.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

806.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Indemnity Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $19,000.00, the exact amount to be determined at trial.

807.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Anderson, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FORTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LIVE AGAIN MEDICAL SUPPLY AND ANDERSON

### (Common Law Fraud)

808.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

809.    Defendants Live Again Medical Supply and Anderson made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company for payment.

810.    On information and belief, each and every bill and supporting documentation submitted by Defendants Live Again Medical Supply and Anderson to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

811.    On information and belief, Defendants Live Again Medical Supply and Anderson intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Live Again Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Anderson, through Live Again Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Anderson, through Live Again Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

812.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Live Again Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

813.    Defendants Live Again Medical Supply and Anderson knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

814.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Live Again Medical Supply and Anderson.

815.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Live Again Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

816.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Live Again Medical Supply and Anderson evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

817.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FORTY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LIVE AGAIN MEDICAL SUPPLY AND ANDERSON

### (Unjust Enrichment)

818.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

819.   By reason of their wrongdoing, Defendants Live Again Medical Supply and Anderson have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, and Allstate Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

820.    Plaintiffs are therefore entitled to restitution from Defendants Live Again Medical Supply and Anderson in the amount by which it has been unjustly enriched.

821.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FORTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

822.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

823.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company by Defendants Live Again Medical Supply and Anderson.

824.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Live Again Medical Supply and Anderson purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Live Again Medical Supply and Anderson could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Anderson, through Live Again Medical Supply, to Live Again Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Live Again Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Anderson, through Live Again Medical Supply, and the No-fault Clinics.

825. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Live Again Medical Supply and Anderson to obtain fraudulently inflated payments from Plaintiffs, among others.

826. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

827.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company to pay money based upon the fraudulent charges submitted through Live Again Medical Supply in an amount to be determined at trial, but in no event less than $20,000.00.

828.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

829.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FORTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MAGOR, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

830.     The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

831.     At all times relevant herein, M & M Supplies Group was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

832.     From, in or about January 3, 2019 through the date of the filing of this Complaint, Defendant Magor, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the M & M Supplies

Group enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

833.    At all relevant times mentioned herein, Defendant Magor, together with others unknown to Plaintiffs, exerted control over and directed the operations of the M & M Supplies Group enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

834.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Magor required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

835.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

836.    The racketeering acts set forth herein were carried out on a continued basis for more than a eleven month period, were related and similar and were committed as part of the ongoing scheme of Defendants Magor, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

837.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as M & M Supplies Group continues to pursue collection on the fraudulent billing to the present day.

838.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Magor, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the M & M Supplies Group enterprise based upon materially false and misleading information.

839.    Through the M & M Supplies Group enterprise, Defendant Magor submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Magor, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Magor, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud,

extending from the formation of the M & M Supplies Group enterprise through the filing of this Complaint.

840.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Magor, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

841.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

842.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

843.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $31,000.00, the exact amount to be determined at trial.

844.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Magor, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FORTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS M & M SUPPLIES GROUP AND MAGOR

### (Common Law Fraud)

845.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

846.   Defendants M & M Supplies Group and Magor made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

847.   On information and belief, each and every bill and supporting documentation submitted by Defendants M & M Supplies Group and Magor to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

848.   On information and belief, Defendants M & M Supplies Group and Magor intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts M & M Supplies Group was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Magor, through M & M Supplies Group, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Magor, through M & M Supplies Group, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

849. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant M & M Supplies Group's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

850. Defendants M & M Supplies Group and Magor knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

851.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants M & M Supplies Group and Magor.

852.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendants M & M Supplies Group's claims for No-fault insurance benefits submitted in connection therewith.

853.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants M & M Supplies Group and Magor evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

854.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $33,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### FIFTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS M & M SUPPLIES GROUP AND MAGOR

### (Unjust Enrichment)

855.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

856.    By reason of their wrongdoing, Defendants M & M Supplies Group and Magor have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

857. Plaintiffs are therefore entitled to restitution from Defendants M & M Supplies Group and Magor in the amount by which it has been unjustly enriched.

858. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $33,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FIFTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

859. The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

860. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants M & M Supplies Group and Magor.

861. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants M & M Supplies Group and Magor purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants M & M Supplies Group and Magor could mail fraudulent bills to Plaintiff and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Magor, through M & M Supplies Group, to M & M Supplies Group to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through M & M Supplies Group; and (v) knowingly supporting the negotiation and performance of kickback agreements between Magor, through M & M Supplies Group, and the No-fault Clinics.

862. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants M & M Supplies Group and Magor to obtain fraudulently inflated payments from Plaintiffs, among others.

863. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

864. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through M & M Supplies Group in an amount to be determined at trial, but in no event less than $33,000.00.

865. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

866. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FIFTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS BAYBEKOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

867. The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

868. At all times relevant herein, MetaMed Sports & Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

869. From, in or about August 12, 2016 through the date of the filing of this Complaint, Defendant Baybekov, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 1 through 20, knowingly conducted and participated in the affairs of the MetaMed Sports & Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

870.    At all relevant times mentioned herein, Defendant Baybekov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the MetaMed Sports & Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

871.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Baybekov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

872.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

873.    The racketeering acts set forth herein were carried out on a continued basis for more than a three-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Baybekov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

874.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as MetaMed Sports & Supply continues to pursue collection on the fraudulent billing to the present day.

875.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Baybekov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the MetaMed Sports & Supply enterprise based upon materially false and misleading information.

876.    Through the MetaMed Sports & Supply enterprise, Defendant Baybekov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Baybekov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By

virtue of those activities, Defendants Baybekov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the MetaMed Sports & Supply enterprise through the filing of this Complaint.

877.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Baybekov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

878.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

879.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

880.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $48,000.00, the exact amount to be determined at trial.

881.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Baybekov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTY-THIRD CLAIM FOR RELIEF
## AGAINST DEFENDANTS METAMED SPORTS & SUPPLY AND BAYBEKOV

### (Common Law Fraud)

882.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

883.    Defendants MetaMed Sports & Supply and Baybekov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

884.    On information and belief, each and every bill and supporting documentation submitted by Defendants MetaMed Sports & Supply and Baybekov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

885.    On information and belief, Defendants MetaMed Sports & Supply and Baybekov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts MetaMed Sports & Supply was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Baybekov, through MetaMed Sports & Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Baybekov, through MetaMed Sports & Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

886.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant MetaMed Sports & Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

887.   Defendants MetaMed Sports & Supply and Baybekov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

888.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants MetaMed Sports & Supply and Baybekov.

889.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant MetaMed Sports & Supply's claims for No-fault insurance benefits submitted in connection therewith.

890.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants MetaMed Sports & Supply and Baybekov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

891.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $48,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS METAMED SPORTS & SUPPLY AND BAYBEKOV

### (Unjust Enrichment)

892.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

893.    By reason of their wrongdoing, Defendants MetaMed Sports & Supply and Baybekov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

894.     Plaintiffs are therefore entitled to restitution from Defendants MetaMed Sports & Supply and Baybekov in the amount by which it has been unjustly enriched.

895.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $48,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FIFTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

896.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

897.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants MetaMed Sports & Supply and Baybekov.

898.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants MetaMed Sports & Supply and Baybekov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants MetaMed Sports & Supply and Baybekov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Baybekov, through MetaMed Sports & Supply, to MetaMed Sports & Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through MetaMed Sports & Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Baybekov, through MetaMed Sports & Supply, and the No-fault Clinics.

899.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants MetaMed Sports & Supply and Baybekov to obtain fraudulently inflated payments from Plaintiffs, among others.

900.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

901.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through MetaMed Sports & Supply in an amount to be determined at trial, but in no event less than $48,000.00.

902.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

903.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FIFTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS FISUN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

904.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

905.    At all times relevant herein, MFS Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

906.    From, in or about June 4, 2018 through the date of the filing of this Complaint, Defendants Fisun, one or more of the ABC Corporations 1 through 20 and one or more of the John

Does 1 through 20, knowingly conducted and participated in the affairs of the MFS Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

907.    At all relevant times mentioned herein, Defendant Fisun, together with others unknown to Plaintiffs, exerted control over and directed the operations of the MFS Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

908.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Fisun required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

909.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

910.    The racketeering acts set forth herein were carried out on a continued basis for more than a seven-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Fisun, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

911.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as MFS Supply continues to pursue collection on the fraudulent billing to the present day.

912.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Fisun, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the MFS Supply enterprise based upon materially false and misleading information.

913.    Through the MFS Supply enterprise, Defendant Fisun submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Fisun, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those

activities, Defendants Fisun, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the MFS Supply enterprise through the filing of this Complaint.

914.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Fisun, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

915.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

916.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

917.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $22,000.00, the exact amount to be determined at trial.

918.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Fisun, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MFS SUPPLY AND FISUN

### (Common Law Fraud)

919.  The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

920.  Defendants MFS Supply and Fisun made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

921.  On information and belief, each and every bill and supporting documentation submitted by Defendants MFS Supply and Fisun to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

922.  On information and belief, Defendants MFS Supply and Fisun intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts MFS Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant and Fisun, through MFS Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Fisun, through MFS Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

923. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant MFS Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

924. Defendants MFS Supply and Fisun knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

925. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants MFS Supply and Fisun.

926.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant MFS Supply's claims for No-fault insurance benefits submitted in connection therewith.

927.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants MFS Supply and Fisun evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

928.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $22,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**FIFTY-EIGHTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS MFS SUPPLY AND FISUN**

**(Unjust Enrichment)**

929.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

930.     By reason of their wrongdoing, Defendants MFS Supply and Fisun have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

931.     Plaintiffs are therefore entitled to restitution from Defendants MFS Supply and Fisun in the amount by which it has been unjustly enriched.

932.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $22,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FIFTY-NINTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

**(Aiding and Abetting)**

933.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

934.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants MFS Supply and Fisun.

935.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants MFS Supply and Fisun purportedly provided to No-fault Claimants; (ii) knowingly providing the

fraudulent wholesale invoices so that Defendants MFS Supply and Fisun could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Fisun, through MFS Supply, to MFS Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through MFS Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Fisun, through MFS Supply, and the No-fault Clinics.

936.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants MFS Supply and Fisun to obtain fraudulently inflated payments from Plaintiffs, among others.

937.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

938.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through MFS Supply in an amount to be determined at trial, but in no event less than $22,000.00.

939.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

940.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SIXTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS KHAIMOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

941.    The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

942.    At all times relevant herein, Mogul Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

943.    From, in or about September 12, 2018 through the date of the filing of this Complaint, Defendants Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Mogul Supplies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in

the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

944.     At all relevant times mentioned herein, Defendant Khaimov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Mogul Supplies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Fire and Casualty Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

945.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Khaimov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff Allstate Fire and Casualty Insurance Company for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

946.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff Allstate Fire and Casualty Insurance Company .

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

947.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

948.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Mogul Supplies continues to pursue collection on the fraudulent billing to the present day.

949.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Khaimov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Fire and Casualty Insurance Company and to induce Plaintiff Allstate Fire and Casualty Insurance Company to issue checks to the Mogul Supplies enterprise based upon materially false and misleading information.

950.    Through the Mogul Supplies enterprise, Defendant Khaimov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Khaimov, as well as the payments that Plaintiff Allstate Fire and Casualty Insurance Company made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Khaimov, one or more of

the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Mogul Supplies enterprise through the filing of this Complaint.

951.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Khaimov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

952.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

953.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

954.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in their business and property and Plaintiff Allstate Fire and Casualty has been damaged in the aggregate amount presently in excess of $4,600.00, the exact amount to be determined at trial.

955.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Fire and Casualty Insurance Company are entitled to recover from Defendants Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SIXTY-FIRST CLAIM FOR RELIEF**

**AGAINST DEFENDANTS MOGUL SUPPLIES AND KHAIMOV**

**(Common Law Fraud)**

956.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

957.    Defendants Mogul Supplies and Khaimov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company for payment.

958.    On information and belief, each and every bill and supporting documentation submitted by Defendants Mogul Supplies and Khaimov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

959.    On information and belief, Defendants Mogul Supplies and Khaimov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Mogul Supplies was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME

and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Khaimov, through Mogul Supplies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Khaimov, through Mogul Supplies, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

960.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Mogul Supplies' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

961.    Defendants Mogul Supplies and Khaimov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

962.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Mogul Supplies and Khaimov.

963.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Mogul Supplies' claims for No-fault insurance benefits submitted in connection therewith.

964.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Mogul Supplies and Khaimov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

965.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $4,700.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS MOGUL SUPPLIES AND KHAIMOV

### (Unjust Enrichment)

966.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

967.    By reason of their wrongdoing, Defendants Mogul Supplies and Khaimov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

968.     Plaintiffs are therefore entitled to restitution from Defendants Mogul Supplies and Khaimov in the amount by which it has been unjustly enriched.

969.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $4,700.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### SIXTY-THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

970.     The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

971.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company by Defendants Mogul Supplies and Khaimov.

972.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Mogul Supplies and Khaimov purportedly provided to No-fault Claimants; (ii) knowingly

providing the fraudulent wholesale invoices so that Defendants Mogul Supplies and Khaimov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Khaimov, through Mogul Supplies, to Mogul Supplies to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Mogul Supplies; and (v) knowingly supporting the negotiation and performance of kickback agreements between Khaimov, through Mogul Supplies, and the No-fault Clinics.

973.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Mogul Supplies and Khaimov to obtain fraudulently inflated payments from Plaintiffs, among others.

974.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

975.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Indemnity Company to pay money based upon the fraudulent charges submitted through Mogul Supplies in an amount to be determined at trial, but in no event less than $4,700.00.

976. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

977. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### SIXTY-FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MIRAKOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

978. The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

979. At all times relevant herein, New Capital 1 was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

980. From, in or about December 5, 2017 through the date of the filing of this Complaint, Defendant Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the New Capital 1 enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix

and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

981.    At all relevant times mentioned herein, Defendant Mirakov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the New Capital 1 enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

982.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Mirakov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

983.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

984.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme

of Defendants Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

985.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as New Capital 1 continues to pursue collection on the fraudulent billing to the present day.

986.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Mirakov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the New Capital 1 enterprise based upon materially false and misleading information.

987.    Through the New Capital 1 enterprise, Defendant Mirakov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Mirakov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the New Capital 1 enterprise through the filing of this Complaint.

988.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Mirakov,

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

989.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

990.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

991.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $10,000.00, the exact amount to be determined at trial.

992.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SIXTY-FIFTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS NEW CAPITAL 1 AND MIRAKOV**

**(Common Law Fraud)**

993.    The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

994.    Defendants New Capital 1 and Mirakov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance

Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

995.    On information and belief, each and every bill and supporting documentation submitted by Defendants New Capital 1 and Mirakov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

996.    On information and belief, Defendants New Capital 1 and Mirakov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts New Capital 1 was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Mirakov, through New Capital 1, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Mirakov, through New Capital 1, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

997.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant New Capital 1's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

998.    Defendants New Capital 1 and Mirakov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

999.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants New Capital 1 and Mirakov.

1000.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant New Capital 1's claims for No-fault insurance benefits submitted in connection therewith.

1001.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants New Capital 1 and Mirakov evinces a high degree of moral turpitude and wanton dishonesty, which, as

alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1002.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $11,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**SIXTY-SIXTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS NEW CAPITAL 1 AND MIRAKOV**

**(Unjust Enrichment)**

1003.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1004.   By reason of their wrongdoing, Defendants New Capital 1 and Mirakov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1005.   Plaintiffs are therefore entitled to restitution from Defendants New Capital 1 and Mirakov in the amount by which it has been unjustly enriched.

1006.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as

yet to be determined, but believed to be in excess of $11,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1007.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1008.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants New Capital 1 and Mirakov.

1009.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants New Capital 1 and Mirakov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants New Capital 1 and Mirakov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Mirakov, through New Capital 1, to New Capital 1, to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or

quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through New Capital 1; and (v) knowingly supporting the negotiation and performance of kickback agreements between Mirakov, through New Capital 1, and the No-fault Clinics.

1010.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants New Capital 1 and Mirakov to obtain fraudulently inflated payments from Plaintiffs, among others.

1011.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1012.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through New Capital 1 in an amount to be determined at trial, but in no event less than $11,000.00.

1013.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1014.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### SIXTY-EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS PROSOLOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1015.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1016.   At all times relevant herein, Protechmed was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1017.   From, in or about February 1, 2017 through the date of the filing of this Complaint, Defendants Prosolov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Protechmed enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1018.   At all relevant times mentioned herein, Defendant Prosolov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Protechmed enterprise and utilized that control to conduct the pattern of racketeering activities that consisted

of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1019.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Prosolov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1020.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

1021.   The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Prosolov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1022.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Protechmed continues to pursue collection on the fraudulent billing to the present day.

1023.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Prosolov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Protechmed enterprise based upon materially false and misleading information.

1024.   Through the Protechmed enterprise, Defendant Prosolov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Prosolov, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Prosolov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Protechmed enterprise through the filing of this Complaint.

1025.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Prosolov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1026.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1027.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

1028.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $216,000.00, the exact amount to be determined at trial.

1029.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Prosolov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SIXTY-NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS PROTECHMED AND PROSOLOV

### (Common Law Fraud)

1030.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1031.   Defendants Protechmed and Prosolov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1032.   On information and belief, each and every bill and supporting documentation submitted by Defendants Protechmed and Prosolov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1033.   On information and belief, Defendants Protechmed and Prosolov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Protechmed was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Prosolov, through Protechmed, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Prosolov, through Protechmed, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1034. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Protechmed's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1035. Defendants Protechmed and Prosolov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1036. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Protechmed and Prosolov.

1037. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Protechmed's claims for No-fault insurance benefits submitted in connection therewith.

1038. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Protechmed and Prosolov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1039.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $216,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**SEVENTIETH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS PROTECHMED AND PROSOLOV**

**(Unjust Enrichment)**

1040.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1041.   By reason of their wrongdoing, Defendants Protechmed and Prosolov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1042.   Plaintiffs are therefore entitled to restitution from Defendants Protechmed and Prosolov in the amount by which it has been unjustly enriched.

1043.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $216,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### SEVENTY-FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1044.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1045.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Protechmed and Prosolov.

1046.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Protechmed and Prosolov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Protechmed and Prosolov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Prosolov, through Protechmed, to Protechmed to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Protechmed; and (v) knowingly supporting the negotiation and

performance of kickback agreements between Prosolov, through Protechmed, and the No-fault Clinics.

1047.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Protechmed and Prosolov to obtain fraudulently inflated payments from Plaintiffs, among others.

1048.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1049.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Protechmed in an amount to be determined at trial, but in no event less than $216,000.00.

1050.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1051.  By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS REYZIS, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

1052.  The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

1053.  At all times relevant herein, RVS Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1054.  From, in or about May 30, 2018 through the date of the filing of this Complaint, Defendant Reyzis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the RVS Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1055.  At all relevant times mentioned herein, Defendant Reyzis, together with others unknown to Plaintiffs, exerted control over and directed the operations of the RVS Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting

documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1056.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Reyzis required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1057.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1058.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Reyzis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1059.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as RVS Supply continues to pursue collection on the fraudulent billing to the present day.

1060.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Reyzis, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the RVS Supply enterprise based upon materially false and misleading information.

1061.   Through the RVS Supply enterprise, Defendant Reyzis submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Reyzis, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Reyzis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the RVS Supply enterprise through the filing of this Complaint.

1062.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Reyzis, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1063.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1064.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1065.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $23,000.00, the exact amount to be determined at trial.

1066.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Reyzis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SEVENTY-THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS RVS SUPPLY AND REYZIS**

**(Common Law Fraud)**

1067.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1068.   Defendants RVS Supply and Reyzis made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1069.   On information and belief, each and every bill and supporting documentation submitted by Defendants RVS Supply and Reyzis to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud

Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1070. On information and belief, Defendants RVS Supply and Reyzis intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts RVS Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Reyzis, through RVS Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Reyzis, through RVS Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1071.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant RVS Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1072.   Defendants RVS Supply and Reyzis knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1073.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants RVS Supply and Reyzis.

1074.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant RVS Supply's claims for No-fault insurance benefits submitted in connection therewith.

1075.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants RVS Supply and Reyzis evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1076.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $24,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS RVS SUPPLY AND REYZIS

### (Unjust Enrichment)

1077.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1078.   By reason of their wrongdoing, Defendants RVS Supply and Reyzis have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1079.   Plaintiffs are therefore entitled to restitution from Defendants RVS Supply and Reyzis in the amount by which it has been unjustly enriched.

1080.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $24,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SEVENTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1081.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1082.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants RVS Supply and Reyzis.

1083.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants RVS Supply and Reyzis purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants RVS Supply and Reyzis could mail fraudulent bills to Plaintiff and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Reyzis, through RVS Supply, to RVS Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through RVS Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Reyzis, through RVS Supply, and the No-fault Clinics.

1084.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical

to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants RVS Supply and Reyzis to obtain fraudulently inflated payments from Plaintiffs, among others.

1085.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1086.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through RVS Supply in an amount to be determined at trial, but in no event less than $24,000.00.

1087.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1088.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS TOKAR, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1089.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1090.   At all times relevant herein, Salutem Products was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1091.   From, in or about April 25, 2018 through the date of the filing of this Complaint, Defendant Tokar, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Salutem Products enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1092.   At all relevant times mentioned herein, Defendant Tokar, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Salutem Products enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1093.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Tokar required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1094.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1095.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Tokar, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1096.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Salutem Products continues to pursue collection on the fraudulent billing to the present day.

1097.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Tokar, with the knowledge and intent

of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Salutem Products enterprise based upon materially false and misleading information.

1098.   Through the Salutem Products enterprise, Defendant Tokar submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Tokar, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Tokar, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Salutem Products enterprise through the filing of this Complaint.

1099.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Tokar, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1100.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1101.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1102.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $38,000.00, the exact amount to be determined at trial.

1103.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Tokar, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SEVENTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SALUTEM PRODUCTS AND TOKAR

### (Common Law Fraud)

1104.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1105.   Defendants Salutem Products and Tokar made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

1106.   On information and belief, each and every bill and supporting documentation submitted by Defendants Salutem Products and Tokar to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud

Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1107.   On information and belief, Defendants Salutem Products and Tokar intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Salutem Products was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Tokar, through Salutem Products, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Tokar, through Salutem Products, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1108.  The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants Salutem Products' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1109.  Defendants Salutem Products and Tokar knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1110.  Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Salutem Products and Tokar.

1111.  Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Salutem Products' claims for No-fault insurance benefits submitted in connection therewith.

1112.  Furthermore, the far reaching pattern of fraudulent conduct by Defendants Salutem Products and Tokar evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1113.  By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $40,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SALUTEM PRODUCTS AND TOKAR

### (Unjust Enrichment)

1114.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1115.   By reason of their wrongdoing, Defendants Salutem Products and Tokar have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1116.   Plaintiffs are therefore entitled to restitution from Defendants Salutem Products and Tokar in the amount by which they have been unjustly enriched.

1117.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $40,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SEVENTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1118.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1119. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Salutem Products and Tokar.

1120. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Salutem Products and Tokar purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Salutem Products and Tokar could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Tokar, through Salutem Products, to Salutem Products to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Salutem Products; and (v) knowingly supporting the negotiation and performance of kickback agreements between Tokar, through Salutem Products, and the No-fault Clinics.

1121. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical

to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Salutem Products and Tokar to obtain fraudulently inflated payments from Plaintiffs, among others.

1122.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1123.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Salutem Products in an amount to be determined at trial, but in no event less than $40,000.00.

1124.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1125.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### EIGHTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS BORUKHOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1126.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1127.   At all times relevant herein, SP One Services was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1128.   From, in or about May 11, 2018 through the date of the filing of this Complaint, Defendant Borukhov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the SP One Services enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1129.   At all relevant times mentioned herein, Defendant Borukhov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the SP One Services enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1130.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Borukhov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1131.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1132.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Borukhov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1133.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as SP One Services continues to pursue collection on the fraudulent billing to the present day.

1134.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Borukhov, with the knowledge and

intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the SP One Services enterprise based upon materially false and misleading information.

1135. Through the SP One Services enterprise, Defendant Borukhov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Borukhov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Borukhov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the SP One Services enterprise through the filing of this Complaint.

1136. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Borukhov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1137. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1138. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1139.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $16,000.00, the exact amount to be determined at trial.

1140.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Borukhov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS SP ONE SERVICES AND BORUKHOV

### (Common Law Fraud)

1141.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1142.   Defendants SP One Services and Borukhov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

1143.   On information and belief, each and every bill and supporting documentation submitted by Defendants SP One Services and Borukhov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1144. On information and belief, Defendants SP One Services and Borukhov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts SP One Services was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Borukhov, through SP One Services, paid kickbacks to No-fault

Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Borukhov, through SP One Services, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1145.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant SP One Services' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1146.    Defendants SP One Services and Borukhov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1147.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants SP One Services and Borukhov.

1148.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant SP One Services' claims for No-fault insurance benefits submitted in connection therewith.

1149.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants SP One Services and Borukhov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1150. By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $16,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS SP ONE SERVICES AND BORUKHOV

### (Unjust Enrichment)

1151. The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1152. By reason of their wrongdoing, Defendants SP One Services and Borukhov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1153. Plaintiffs are therefore entitled to restitution from Defendants SP One Services and Borukhov in the amount by which they have been unjustly enriched.

1154. By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $16,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1155.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1156.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants SP One Services and Borukhov.

1157.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants SP One Services and Borukhov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants SP One Services and Borukhov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Borukhov, through SP One Services, to Borukhov to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through SP One Services; and (v)

knowingly supporting the negotiation and performance of kickback agreements between Borukhov, through SP One Services, and the No-fault Clinics.

1158.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants SP One Services and Borukhov to obtain fraudulently inflated payments from Plaintiffs, among others.

1159.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1160.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through SP One Services in an amount to be determined at trial, but in no event less than $16,000.00.

1161.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1162.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## EIGHTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS YOUNATANOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

1163.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

1164.   At all times relevant herein, Sutphin Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1165.   From in or about March 22, 2018 through the date of the filing of this Complaint, Defendant Younatanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Sutphin Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1166.   At all relevant times mentioned herein, Defendant Younatanov together with others unknown to Plaintiffs, exerted control over and directed the operations of the Sutphin Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1167.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Younatanov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1168.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1169.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Younatanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1170.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Sutphin Supply continues to pursue collection on the fraudulent billing to the present day.

1171.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Younatanov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Sutphin Supply enterprise based upon materially false and misleading information.

1172.   Through the Sutphin Supply enterprise, Defendant Younatanov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Younatanov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Younatanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Sutphin Supply enterprise through the filing of this Complaint.

1173.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Younatanov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1174.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1175.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

1176.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company  have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $10,000.00, the exact amount to be determined at trial.

1177.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Younatanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SUTPHIN SUPPLY AND YOUNATANOV

## (Common Law Fraud)

1178.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1179.   Defendants Sutphin Supply and Younatanov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

1180.   On information and belief, each and every bill and supporting documentation submitted by Defendants Sutphin Supply and Younatanov to Plaintiffs set forth false and

fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1181. On information and belief, Defendants Sutphin Supply and Younatanov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Sutphin Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Younatanov, through Sutphin Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices

were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Younatanov, through Sutphin Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1182.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Sutphin Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1183.   Defendants Sutphin Supply and Younatanov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1184.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Sutphin Supply and Younatanov.

1185.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Sutphin Supply's claims for No-fault insurance benefits submitted in connection therewith.

1186.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Sutphin Supply and Younatanov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1187.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as

yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SUTPHIN SUPPLY AND YOUNATANOV

### (Unjust Enrichment)

1188.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1189.   By reason of their wrongdoing, Defendants Sutphin Supply and Younatanov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1190.   Plaintiffs are therefore entitled to restitution from Defendants Sutphin Supply and Younatanov in the amount by which it has been unjustly enriched.

1191.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**EIGHTY-SEVENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND
JOHN DOES 1 THROUGH 20**

**(Aiding and Abetting)**

1192.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1193.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Sutphin Supply and Younatanov.

1194.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Sutphin Supply and Younatanov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Sutphin Supply and Younatanov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Younatanov, through Sutphin Supply, to Sutphin Supply and Younatanov to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through

Sutphin Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Younatanov, through Sutphin Supply, and the No-fault Clinics.

1195.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Sutphin Supply and Younatanov to obtain fraudulently inflated payments from Plaintiffs, among others.

1196.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1197.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Sutphin Supply in an amount to be determined at trial, but in no event less than $10,000.00.

1198.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1199.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## EIGHTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS GAVRILOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1200.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1201.   At all times relevant herein, Unicast was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1202.   From, in or about July 11, 2018 through the date of the filing of this Complaint, Defendant Gavrilov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Unicast enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1203.   At all relevant times mentioned herein, Defendant Gavrilov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Unicast enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1204.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Gavrilov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1205.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1206.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Gavrilov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1207.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Unicast continues to pursue collection on the fraudulent billing to the present day.

1208.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Gavrilov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to Unicast enterprise based upon materially false and misleading information.

1209.   Through the Unicast enterprise, Defendant Gavrilov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Gavrilov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Gavrilov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Unicast enterprise through the filing of this Complaint.

1210.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Gavrilov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1211.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1212.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

1213.  By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $41,000.00, the exact amount to be determined at trial.

1214.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Gavrilov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS UNICAST AND GAVRILOV

## (Common Law Fraud)

1215.  The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1216.  Defendants Unicast and Gavrilov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1217.  On information and belief, each and every bill and supporting documentation submitted by Defendants Unicast and Gavrilov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault

Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1218. On information and belief, Defendants Unicast and Gavrilov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Unicast was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Gavrilov, through Unicast, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Gavrilov through Unicast, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1219.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Unicast's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1220.   Defendants Unicast and Gavrilov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1221.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Unicast and Gavrilov.

1222.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Unicast's claims for No-fault insurance benefits submitted in connection therewith.

1223.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Unicast and Gavrilov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1224.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $41,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINETIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS UNICAST AND GAVRILOV

## (Unjust Enrichment)

1225.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1226.   By reason of their wrongdoing, Defendants Unicast and Gavrilov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1227.   Plaintiffs are therefore entitled to restitution from Defendants Unicast and Gavrilov in the amount by which it has been unjustly enriched.

1228.   By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $41,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (Aiding and Abetting)

1229.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1230.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and

abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Unicast and Gavrilov.

1231.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Unicast and Gavrilov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Unicast and Gavrilov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Gavrilov through Unicast to Unicast to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Unicast; and (v) knowingly supporting the negotiation and performance of kickback agreements between Gavrilov, through Unicast, and the No-fault Clinics.

1232.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Unicast and Gavrilov to obtain fraudulently inflated payments from Plaintiffs, among others.

1233.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1234.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Unicast in an amount to be determined at trial, but in no event less than $41,000.00.

1235.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1236.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

## NINETY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS BOROOCHOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1237. The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1238. At all times relevant herein, Union DME was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1239. From, in or about August 3, 2018 through the date of the filing of this Complaint, Defendant Boroochov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Union DME enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1240. At all relevant times mentioned herein, Defendant Boroochov together with others unknown to Plaintiffs, exerted control over and directed the operations of the Union DME enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

1241.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Boroochov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1242.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1243.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Boroochov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1244.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Boroochov continues to pursue collection on the fraudulent billing to the present day.

1245.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Boroochov with the knowledge and

intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Union DME enterprise based upon materially false and misleading information.

1246.   Through the Union DME enterprise, Defendant Boroochov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Boroochov, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Boroochov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of Union DME enterprise through the filing of this Complaint.

1247.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Boroochov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1248.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1249.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1250.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $18,000.00, the exact amount to be determined at trial.

1251.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Boroochov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**NINETY-THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS UNION DME AND BOROOCHOV**

**(Common Law Fraud)**

1252.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1253.   Defendants Union DME and Boroochov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company for payment.

1254.   On information and belief, each and every bill and supporting documentation submitted by Defendants Union DME and Boroochov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1255.  On information and belief, Defendants Union DME and Boroochov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Union DME was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Boroochov, through Union DME, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Boroochov through Union DME, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1256.  The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Union DME's claims under the No-fault Law. Specific examples of the billing fraud alleged herein

are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1257.  Defendants Union DME and Boroochov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1258.  Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Union DME and Boroochov.

1259.  Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Union DME's claims for No-fault insurance benefits submitted in connection therewith.

1260.  Furthermore, the far reaching pattern of fraudulent conduct by Defendants Union DME and Boroochov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1261.  By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $18,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINETY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS UNION DME AND BOROOCHOV

### (Unjust Enrichment)

1262.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1263.   By reason of their wrongdoing, Defendants Union DME and Boroochov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1264.   Plaintiffs are therefore entitled to restitution from Defendants Union DME and Boroochov in the amount by which it has been unjustly enriched.

1265.   By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $18,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1266.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1267.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and

abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Union DME and Boroochov.

1268.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Union DME and Boroochov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Union DME and Boroochov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Boroochov through Union DME to Union DME to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Union DME; and (v) knowingly supporting the negotiation and performance of kickback agreements between Boroochov, through Union DME, and the No-fault Clinics.

1269.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Union DME and Boroochov to obtain fraudulently inflated payments from Plaintiffs, among others.

1270.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1271.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Union DME in an amount to be determined at trial, but in no event less than $18,000.00.

1272.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1273.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## NINETY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MERGOLD, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1274.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

320

**THE RICO ENTERPRISE**

1275.   At all times relevant herein, US Health Products was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1276.   From, in or about July 12, 2012 through the date of the filing of this Complaint, Defendant Mergold, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the US Health Products enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1277.   At all relevant times mentioned herein, Defendant Mergold together with others unknown to Plaintiffs, exerted control over and directed the operations of the US Health Products enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

1278.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint.

One or more of the ABC Corporations furnished documents that Defendant Mergold required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1279.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

1280.   The racketeering acts set forth herein were carried out on a continued basis for more than a seven-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Mergold, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1281.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Mergold continues to pursue collection on the fraudulent billing to the present day.

1282.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Mergold with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the US Health Products enterprise based upon materially false and misleading information.

1283.  Through the US Health Products enterprise, Defendant Mergold submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Mergold, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Mergold, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of US Health Products enterprise through the filing of this Complaint.

1284.  A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Mergold in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1285.  Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1286.  Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1287.  By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $43,000.00, the exact amount to be determined at trial.

1288.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Mergold, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINETY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS US HEALTH PRODUCTS AND MERGOLD

### (Common Law Fraud)

1289.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1290.   Defendants US Health Products and Mergold made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1291.   On information and belief, each and every bill and supporting documentation submitted by Defendants US Health Products and Mergold to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1292.   On information and belief, Defendants US Health Products and Mergold intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts,

including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts US Health Products was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Mergold, through US Health Products, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Mergold through US Health Products, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1293.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant US Health Products' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1294.   Defendants US Health Products and Mergold knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1295.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants US Health Products and Mergold.

1296.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant US Health Products' claims for No-fault insurance benefits submitted in connection therewith.

1297.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants US Health Products and Mergold evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1298.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $44,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINETY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS US HEALTH PRODUCTS AND MERGOLD

### (Unjust Enrichment)

1299. The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1300. By reason of their wrongdoing, Defendants US Health Products and Mergold have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1301. Plaintiffs are therefore entitled to restitution from Defendants US Health Products and Mergold in the amount by which it has been unjustly enriched.

1302. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $44,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETY- NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1303. The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1304.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants US Health Products and Mergold.

1305.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants US Health Products and Mergold purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that US Health Products and Mergold could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Mergold, through US Health Products, to US Health Products to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through US Health Products; and (v) knowingly supporting the negotiation and performance of kickback agreements between Mergold, through US Health Products, and the No-fault Clinics.

1306.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical

to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants US Health Products and Mergold to obtain fraudulently inflated payments from Plaintiffs, among others.

1307.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1308.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through US Health Products in an amount to be determined at trial, but in no event less than $44,000.00.

1309.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1310.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## ONE HUNDREDTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS KLIKSHTEYN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

1311.  The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1312.  At all times relevant herein, VVX was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1313.  From, in or about April 3, 2017 through the date of the filing of this Complaint, Defendant Klikshteyn, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the VVX enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1314.  At all relevant times mentioned herein, Defendant Klikshteyn together with others unknown to Plaintiffs, exerted control over and directed the operations of the VVX enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

1315.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Klikshteyn required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1316.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1317.   The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Klikshteyn, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1318.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Klikshteyn continues to pursue collection on the fraudulent billing to the present day.

1319.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Klikshteyn with the knowledge and

intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the VVX enterprise based upon materially false and misleading information.

1320.   Through the VVX enterprise, Defendant Klikshteyn submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Klikshteyn, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Klikshteyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of VVX enterprise through the filing of this Complaint.

1321.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Klikshteyn in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1322.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1323.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1324.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $8,300.00, the exact amount to be determined at trial.

1325.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Klikshteyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## ONE HUNDREDTH AND FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS VVX AND KLIKSHTEYN

### (Common Law Fraud)

1326.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1327.   Defendants VVX and Klikshteyn made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

1328.   On information and belief, each and every bill and supporting documentation submitted by Defendants VVX and Klikshteyn to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1329.   On information and belief, Defendants VVX and Klikshteyn intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts VVX was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Klikshteyn, through VVX, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Klikshteyn through VVX, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1330.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant VVX's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are

contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1331.   Defendants VVX and Klikshteyn knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1332.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants VVX and Klikshteyn.

1333.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant VVX's claims for No-fault insurance benefits submitted in connection therewith.

1334.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants VVX and Klikshteyn evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1335.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $9,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**ONE HUNDREDTH AND SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS VVX AND KLIKSHTEYN**

**(Unjust Enrichment)**

1336.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1337.   By reason of their wrongdoing, Defendants VVX and Klikshteyn have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1338.   Plaintiffs are therefore entitled to restitution from Defendants VVX and Klikshteyn in the amount by which it has been unjustly enriched.

1339.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $9,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**ONE HUNDREDTH AND THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

**(Aiding and Abetting)**

1340.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1341.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants VVX and Klikshteyn.

1342.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants VVX and Klikshteyn purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that VVX and Klikshteyn could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Klikshteyn through VVX to VVX to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through VVX; and (v) knowingly supporting the negotiation and performance of kickback agreements between Klikshteyn, through VVX, and the No-fault Clinics.

1343.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no

opportunity for Defendants VVX and Klikshteyn to obtain fraudulently inflated payments from Plaintiffs, among others.

1344.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1345.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through VVX in an amount to be determined at trial, but in no event less than $9,000.00.

1346.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1347.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

**ONE HUNDREDTH AND FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS CHERNYSHEV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

1348.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

1349.   At all times relevant herein, Wallegood was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1350.   From, in or about March 13, 2018 through the date of the filing of this Complaint, Defendant Chernyshev, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Wallegood enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1351.   At all relevant times mentioned herein, Defendant Chernyshev together with others unknown to Plaintiffs, exerted control over and directed the operations of the Wallegood enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

1352. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Chernyshev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1353. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

1354. The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Chernyshev, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1355. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Chernyshev continues to pursue collection on the fraudulent billing to the present day.

1356. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Chernyshev with the knowledge and

intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiffs to issue checks to the Wallegood enterprise based upon materially false and misleading information.

1357.   Through the Wallegood enterprise, Defendant Chernyshev submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Chernyshev, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Chernyshev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of Wallegood enterprise through the filing of this Complaint.

1358.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Chernyshev in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1359.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1360.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1361.  By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $51,000.00, the exact amount to be determined at trial.

1362.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Chernyshev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## ONE HUNDREDTH AND FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS WALLEGOOD AND CHERNYSHEV

### (Common Law Fraud)

1363.  The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1364.  Defendants Wallegood and Chernyshev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1365.  On information and belief, each and every bill and supporting documentation submitted by Defendants Wallegood and Chernyshev to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud

Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1366. On information and belief, Defendants Wallegood and Chernyshev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Wallegood was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Chernyshev, through Wallegood, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Chernyshev through Wallegood, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1367.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Wallegood's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1368.   Defendants Wallegood and Chernyshev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1369.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Wallegood and Chernyshev.

1370.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Wallegood's claims for No-fault insurance benefits submitted in connection therewith.

1371.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Wallegood and Chernyshev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1372.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $51,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## ONE HUNDREDTH AND SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS WALLEGOOD AND CHERNYSHEV

### (Unjust Enrichment)

1373.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1374.   By reason of their wrongdoing, Defendants Wallegood and Chernyshev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1375.   Plaintiffs are therefore entitled to restitution from Defendants Wallegood and Chernyshev in the amount by which it has been unjustly enriched.

1376.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $51,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## ONE HUNDREDTH AND SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1377.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1378. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Wallegood and Chernyshev.

1379. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Wallegood and Chernyshev purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Wallegood and Chernyshev could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Chernyshev through Wallegood to Wallegood to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Wallegood; and (v) knowingly supporting the negotiation and performance of kickback agreements between Chernyshev, through Wallegood, and the No-fault Clinics.

1380. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical

to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Wallegood and Chernyshev to obtain fraudulently inflated payments from Plaintiffs, among others.

1381.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1382.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Wallegood in an amount to be determined at trial, but in no event less than $51,000.00.

1383.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1384.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## ONE HUNDREDTH AND EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS DAVYDOV, YAGUDAEV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1385.   The allegations of paragraphs 1 through 395 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1386.   At all times relevant herein, YBD Universal was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1387.   From, in or about May 19, 2017 through the date of the filing of this Complaint, Defendants Davydov and Yagudaev, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the YBD Universal enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1388.   At all relevant times mentioned herein, Defendants Davydov and Yagudaev together with others unknown to Plaintiffs, exerted control over and directed the operations of the YBD Universal enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

1389.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendants Davydov and Yagudaev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1390.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

1391.   The racketeering acts set forth herein were carried out on a continued basis for more than a seven-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Davydov, Yagudaev, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1392.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Davydov and Yagudaev continuesto pursue collection on the fraudulent billing to the present day.

1393. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Davydov and Yagudaev with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the YBD Universal enterprise based upon materially false and misleading information.

1394. Through the YBD Universal enterprise, Defendants Davydov and Yagudaev submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous No-fault Claimants as billed. The bills and supporting documents that were sent by Defendants Davydov and Yagudaev, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Davydov, Yagudaev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of YBD Universal enterprise through the filing of this Complaint.

1395. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Davydov and Yagudaev in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1396. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1397.  Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

1398.  By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $25,000.00, the exact amount to be determined at trial.

1399.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Davydov, Yagudaev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### ONE HUNDREDTH AND NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS YBD UNIVERSAL, DAVYDOV AND YAGUDAEV

### (Common Law Fraud)

1400.  The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1401.  Defendants YBD Universal, Davydov and Yagudaev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1402.  On information and belief, each and every bill and supporting documentation submitted by Defendants YBD Universal, Davydov and Yagudaev to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly

supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1403.   On information and belief, Defendants YBD Universal, Davydov and Yagudaev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts YBD Universal was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendants Davydov and Yagudaev, through YBD Universal, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on

the prescriptions, all of which was designed to permit Defendants Davydov and Yagudaev through YBD Universal, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1404.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant YBD Universal's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1405.   Defendants YBD Universal, Davydov and Yagudaev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1406.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants YBD Universal, Davydov and Yagudaev.

1407.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant YBD Universal's claims for No-fault insurance benefits submitted in connection therewith.

1408.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants YBD Universal, Davydov and Yagudaev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1409.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $28,000.00, the

exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## ONE HUNDRED TENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS YBD UNIVERSAL AND DAVYDOV

### (Unjust Enrichment)

1410.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1411.   By reason of their wrongdoing, Defendants YBD Universal, Davydov and Yagudaev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1412.   Plaintiffs are therefore entitled to restitution from Defendants YBD Universal, Davydov and Yagudaev in the amount by which it has been unjustly enriched.

1413.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $28,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**ONE HUNDRED ELEVENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND
JOHN DOES 1 THROUGH 20**

**(Aiding and Abetting)**

1414.   The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1415.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants YBD Universal, Davydov and Yagudaev.

1416.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants YBD Universal, Davydov and Yagudaev purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that YBD Universal, Davydov and Yagudaev could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Davydov and Yagudaev through YBD Universal to YBD Universal to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through YBD

Universal; and (v) knowingly supporting the negotiation and performance of kickback agreements between Davydov and/or Yagudaev, through YBD Universal, and the No-fault Clinics.

1417.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants YBD Universal, Davydov and Yagudaev to obtain fraudulently inflated payments from Plaintiffs, among others.

1418.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1419.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through YBD Universal in an amount to be determined at trial, but in no event less than $28,000.00.

1420.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1421.  By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## ONE HUNDRED TWELFTH CLAIM FOR RELIEF

## AGAINST ALL RETAIL DEFENDANTS

## (Declaratory Judgment under 28 U.S.C. § 2201)

1422.  The allegations of paragraphs 1 through 395 are hereby repeated and realleged as though fully set forth herein.

1423.  At all relevant times mentioned herein, each and every bill mailed by the Retail Owners, through their respective Retailers, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

1424.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the Retailers' wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

1425.  At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature,

quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Claimants.

1426.   In view of the Retail Defendants submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

1427.   As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed, which they never supplied to No-fault Claimants, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

1428.   Plaintiffs have no adequate remedy at law.

1429.   The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the

pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)     Compensatory damages in an amount in excess of $1,200,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)    Punitive damages in such amount as the Court deems just;

iii)   Treble damages, costs and reasonable attorneys' fees on the First, Fifth, Ninth, Thirteenth, Seventeenth, Twenty-First, Twenty-Fifth, Twenty-Ninth, Thirty-Second, Thirty-Sixth, Fortieth, Forty-Fourth, Forty-Eighth, Fifty-Second, Fifty-Sixth, Sixtieth, Sixty-Fourth, Sixty-Eighth, Seventy-Second, Seventy-Sixth, Eightieth, Eighty-Fourth, Eighty-Eighth, Ninety-Second, Ninety-Sixth, One Hundredth, One Hundred Fourth, and One Hundred Eighth Claims for Relief, together with prejudgment interest;

iv)    Compensatory and punitive damages on the Second, Sixth, Tenth, Fourteenth, Eighteenth, Twenty-Second, Twenty-Sixth, Thirtieth, Thirty-Third, Thirty-Seventh, Forty-First, Forty-Fifth, Forty-Ninth, Fifty-Third, Fifty-Seventh, Sixty-First, Sixty-Fifth, Sixty-Ninth, Seventy-Third, Seventy-Seventh, Eighty-First, Eighty-Fifth, Eighty-Ninth, Ninety-Third, and Ninety-Seventh, One Hundred First, One Hundred Fifth, and One Hundred Ninth Claims for Relief, together with prejudgment interest;

v)     Compensatory damages on the Third, Seventh, Eleventh, Fifteenth, Nineteenth, Twenty-Third, Twenty-Seventh, Thirty-First, Thirty-Fourth, Thirty-Eighth, Forty-Second, Forty-Sixth, Fiftieth, Fifty-Fourth, Fifty-Eighth, Sixty-Second, Sixty-Sixth, Seventieth, Seventy-Fourth, Seventy-Eighth, Eighty-Second, Eighty-Sixth, Ninetieth, Ninety-Fourth, and Ninety-Eighth, One

Hundred Second, One Hundred Sixth, and One Hundred Tenth Claims for Relief, together with prejudgment interest;

vi)       Compensatory and punitive damages on the Fourth, Eighth, Twelfth, Sixteenth, Twentieth, Twenty-Fourth, Twenty-Eighth, Thirty-Fifth, Thirty-Ninth, Forty-Third, Forty-Seventh, Fifty-First, Fifty-Fifth, Fifty-Ninth, Sixty-Third, Sixty-Seventh, Seventy-First, Seventy-Fifth, Seventy-Ninth, Eighty-Third, Eighty-Seventh, Ninety-First, Ninety-Fifth, and Ninety-Ninth, One Hundred Third, One Hundred Seventh, and One Hundred Eleventh Claims for Relief, together with prejudgment interest;

vii)      Declaratory relief on the One Hundred Twelfth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants by submitting claims for DME and/or orthotic devices that they never supplied to No-fault Claimants; and

viii)     Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated:  New York, New York,
       July 23, 2020

                                            Morrison Mahoney LLP

                                 By:   /s/ Lee Pinzow           
                                    Robert A. Stern, Esq.
                                    Daniel S. Marvin, Esq.
                                    James McKenney, Esq.
                                    Lee Pinzow, Esq.
                                    Attorneys for Plaintiffs
                                    Wall Street Plaza
                                    88 Pine Street, Suite 1900
                                    New York, New York 10005
                                    (212) 825-1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | X ) ) ) CIVIL ACTION  20-CV-3302 |
| **Plaintiffs,** | ) ) |
| -against- | ) ) |
| DAVID ABAYEV, RICHARD ANDERSON, MIKHAIL BAYBEKOV, MARKIEL BOROOCHOV, OLEG BORUKHOV, ALEXANDER CHERNYSHEV, YAKUB DAVYOV, MIKHAIL FISUN, VLADIMIR GAVRILOV, OLGA GINDINOVA, STANISLAV GLIKMAN, SOFIA IBORO, VYACHESLAV KHAIMOV, ROMAN KHAITOV, ALINA KHARISOVA, YEFIM KLIKSHTEYN, ARTUR LEVIT, MICHAEL MAGOR, EDUARD MERGOLD, SIMON MIRAKOV, DMITRIY PROSOLOV, ROSTISLAV REYZIS, ALBERT RUBINOV, AHARON SHIMONOV, VYACHESLAV SOROKIN, GRIGORIY TOKAR, PENAY YAGUDAEV, ALBERT YAKUBOV, YAKOV YOUNATANOV, ALENA ZAKHAROVA, AK GLOBAL SUPPLY CORP, AZCARE INC., BIG APPLE MED EQUIPMENT INC, CENTRAL SUPPLIES OF NY CORP, EZ TRIBORO SERVICES, INC., FIVE BOROUGH SUPPLY INC, FRONTLINE FITTERS SURGICAL SUPPLY INC, HEALTH CHOICE PHARMACY INC, HEALTHY LIVING MEDICAL AND SURGICAL PRODUCTS, INC., HEALTHY SUPPORT, INC., iSUPPLY MEDICAL INC, LIVE AGAIN MEDICAL SUPPLY INC., M & M SUPPLIES GROUP INC, METAMED SPORTS & SUPPLY INC., MFS SUPPLY CORP, MOGUL SUPPLIES INC, NEW CAPITAL 1 INC., PROTECHMED INC, RVS SUPPLY CORP, SALUTEM PRODUCTS CORP, SP ONE SERVICES, INC., SUTPHIN SUPPLY INC, UNICAST, INC, UNION DME CORP, U.S. HEALTH PRODUCTS INC., V V X, INC., WALLEGOOD INC., YBD UNIVERSAL CORP, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **COMPLAINT**  **(TRIAL BY JURY DEMANDED)** |
| **Defendants** | ) ) X |

-----------------------------------------------------------------

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212